Argued and submitted June 30, judgment of conviction and
sentence of death affirmed November 4, 2010

# STATE OF OREGON,
*Respondent,*

*v.*

# GARY HAUGEN,
*Appellant.*

## (CC 04C46224; SC S054853)

243 P3d 31

Joseph Guimond, Judge.

Daniel J. Casey, Portland, argued the cause and filed the briefs for appellant.

David B. Thompson, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, Timothy A. Sylwester, Assistant Attorney General, Erika L. Hadlock, Deputy Solicitor General, and Gregory Rios, Assistant Attorney General.

BALMER, J.

De Muniz, C. J., filed a concurring opinion in which Gillette and Durham, JJ., joined.

**BALMER, J.**

This case is before the court on automatic and direct review of defendant's conviction and sentence of death for aggravated murder. *See* ORS 138.012 (providing for direct review in Supreme Court when jury imposes death sentence). Defendant has been an inmate in the Oregon State Penitentiary since 1981, when he was convicted of killing his girlfriend's mother. In 2004, the state indicted defendant and another inmate, Jason Brumwell, for the killing of a third inmate. A jury convicted defendant of one count of aggravated murder for committing murder after previously having been convicted of murder, ORS 163.095(1)(c), and one count of aggravated murder for committing murder while confined in prison, ORS 163.095(2)(b).[1] In a separate penalty-phase proceeding, the jury affirmatively answered the four questions set out in ORS 163.150(1)(b), and the trial court entered a sentence of death. For the reasons that follow, we affirm the judgment of conviction and the sentence of death.

## I. FACTS AND PROCEDURAL HISTORY

In reviewing a judgment of conviction, we state the facts in the light most favorable to the state. *See, e.g., State v. Gibson*, 338 Or 560, 562, 113 P3d 423, *cert den*, 546 US 1044 (2005) (so stating). Shortly after 9:00 a.m. on September 2, 2003, the body of inmate David "Sleepy" Polin (the victim) was found in the band room of the activities section of the Oregon State Penitentiary. He was scheduled to be working in that section of the prison that morning. The victim had sustained 84 stab wounds and a blunt-force trauma to the head resulting in skull fracture. The victim's hands reflected wounds that appeared to have been suffered in defending himself against an attack. The attack had occurred in an alcove outside the band room, which was smeared with blood. Subsequently, the body had been dragged into the band room. The victim's blood also was found in a trash can just

---

[1] Defendant and Brumwell were tried together in the guilt phase of the trial, and the jury also convicted Brumwell of aggravated murder. The penalty-phase proceedings for the two defendants were conducted separately. Brumwell also was sentenced to death. The direct review proceeding of Brumwell's conviction and sentence is pending before this court. We sometimes refer to defendant and Brumwell together as "defendants."

outside the alcove. Inside the trash can was a t-shirt soaked with the victim's blood, one of his shoes, his inmate identification, bloody rags, and a large threaded metal rod with victim's blood on it. The rod was part of a stool from the band room. Two "shanks" or homemade knives also were found in the vicinity (although not in the band room), one of which was hidden in a bathroom drain. Strands of Brumwell's hair were found on the victim's clothing.

Security cameras captured images of defendant and Brumwell shortly before and after 8:00 a.m. Images from several cameras at different locations in the activities section showed defendants and the victim in the general area near the band room in the minutes before the attack. The images showed defendants repeatedly visiting a bathroom, in which one of the shanks later was found, and then showed defendant shortly before the attack with an oddly shaped item concealed under his t-shirt, possibly the metal rod from the stool. Another camera was located in the band room. That camera showed defendants dragging the body into that room. Images from the camera also showed movement through a window in the door to the alcove, just before defendants dragged the body into the band room. Images taken shortly after the attack showed defendants leaving the area and wearing at least some different clothing than they had been wearing 15 minutes earlier.

The day of the murder was "shower" day, when inmates take showers and exchange their clothing. On the morning of the murder, an inmate observed defendant in the shower clipping his fingernails with fingernail clippers and scrubbing his fingernails with a toothbrush. His hands were soiled by some dark substance. The inmate saw Brumwell, whose hands also were soiled, do the same after defendant handed him the fingernail clippers and toothbrush. The dark substance turned red as Brumwell washed. When defendant entered his cell at 9:00 a.m., the pants he was wearing were several sizes too large, and he did not have a belt. Later, in a clothing bin in the shower area, police recovered pants and t-shirts, stained with victim's blood, matching the sizes worn by defendants. One pair of pants had DNA material in the thigh area matching defendant's DNA, suggesting that he

had worn them. Those pants also had a splatter pattern of liquid that matched the victim's blood.

Inmate Robert Cameron testified at the trial. He and defendants were members of a band. Cameron did not go to the activities section the morning of the murder, because Brumwell told him that another band had taken their time slot, which was not true. Instead, Cameron was at his station working as a clerk. Sometime that morning, prior to the discovery of the victim, defendant and Brumwell came to Cameron's work station. Cameron noticed that defendant had a "fat lip." Defendant asked Cameron to get a jacket out of the laundry cart. Brumwell asked Cameron to locate Brumwell's jacket in the laundry cart and rip out the state identification number. Brumwell said that his jacket had a "t-shirt lining," rather than the usual flannel lining. Cameron found such a jacket that had a dark stain on it that appeared to be blood. Cameron did not remove the state identification number as Brumwell had asked; instead, he hid the jacket under a yellow raincoat hanging at the work station. Later, police recovered the jacket and identified the blood on the jacket as the victim's. Cameron also saw defendant and Brumwell take off their shower sandals and put them in a bag. When he asked them about that, Brumwell said something about blood.

Later, in defendant's cell, defendant stated to Cameron that he had killed Polin because he was a "rat." Defendant stated that he and Brumwell had attacked the victim in the alcove outside the band room. Defendant stated that he had stabbed Polin 30 times and related that, despite the wounds he had inflicted, Polin "wouldn't die." He said that he had hit the victim with a "drum chair" from the band room and had "caved his fucking head in." Defendant referred to wounds on his hands and asked Cameron if they were noticeable.[2] Brumwell also admitted to Cameron that he had killed the victim.

Defendants had suspected that someone was informing prison officials about their drug use. Prisoners had

_____

[2] A physician examined defendant's hands a few days later and observed soft-tissue injuries.

noticed that prison officials usually administered drug tests during the week. Accordingly, prisoners timed their drug use for weekends so that they could produce a clean urinalysis during the week. Contrary to the ordinary timing, prison officials gave a Saturday drug test on August 23, 2003, to a friend of defendants, a member of their band, which identified him as having used drugs. The following Sunday, prison officials gave another test, this time to defendants. Defendants were upset about the tests and suspected the presence of an informant. They believed that Polin was the informant.[3] According to Cameron, defendant indicated that he wanted to do "something really bad to that Mexican downstairs," referring to Polin. The day before the murder, another inmate overheard defendants say, referring to the victim, "we've got to get him." The inmate saw Brumwell walk toward the victim clenching his fist until defendant stopped him and said, "Stop, not here."[4] The homicide occurred on Tuesday, September 2. Defendant and Brumwell both tested positive for the presence of marijuana based on the sample from the Sunday test. The test results came back September 5, three days after the murder.

The state indicted defendant and Brumwell for Polin's murder. As noted, after the joint guilt-phase trial, a jury convicted defendants of one count of aggravated murder for committing murder after previously having been convicted of murder, ORS 163.095(1)(c), and one count of aggravated murder for committing murder while confined in prison, ORS 163.095(2)(b). Defendant and Brumwell had separate proceedings for the penalty phase of the trial. At defendant's penalty-phase proceeding, the jury answered the four questions set out in ORS 163.150(1)(b)[5] in the affirmative. The trial court then entered a judgment of conviction

---

[3] There was an informant, but it was not Polin.

[4] In addition, a few days before the murder, defendant told two other inmates that "he was getting ready to do something kind of—kind of foolish and that he was probably getting more time and that we wouldn't be seeing him."

[5] ORS 163.150(1)(b) provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

merging the two counts into a single conviction for aggravated murder and imposing the death penalty.

## II. ANALYSIS

Defendant asserts 29 assignments of error. After reviewing the arguments of counsel, the record, and the court file, we have determined that four of the assignments of error · merit discussion. We summarily reject the remaining assignments of error without discussion, concluding that they either are unpreserved, are controlled by this court's prior decisions, or are otherwise without merit.

### A. *Voir Dire and Guilt Phase*

#### 1. *Interpreters for Jurors (Assignment of Error Number 1)*

Defendant argues that the trial court erred in excusing *sua sponte* two prospective jurors who lacked proficiency in the English language and who needed an interpreter. During *voir dire*, the trial court invited prospective jurors to indicate any reasons for which they should be excused. One prospective juror, Lamloc, stated that his English was "not good enough" and that he had memory problems. Lamloc indicated that it would be difficult for him to concentrate through a lengthy trial and to understand and "process" the evidence adduced at trial. Defense counsel inquired whether an interpreter could be provided, to which the trial court responded that it was not allowed to provide one for jurors. Over defendant's objections, the trial court released Lamloc, explaining that it was doing so both because of "the language issue" and because of Lamloc's admittedly limited "cognitive abilities." The trial court also clarified its position with respect to translators by noting that the Judicial Department would not provide funds for the use of translators for jurors.

Several days later, defense counsel raised concerns that another prospective juror, Montesinos, lacked sufficient

---

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

proficiency in English to serve as a juror. In response, the trial court indicated that it would obtain an interpreter to assist with *voir dire*. During *voir dire*, defense counsel tried questioning Montesinos without using an interpreter. Listening to the responses, the trial court was concerned that Montesinos did not understand the questions. Montesinos then indicated that he would need an interpreter to understand the testimony at trial. The trial court explained that the Judicial Department would provide an interpreter for *voir dire*, but not for trial. As a result, the trial court excused Montesinos over defense objections.

Defendant challenges the trial court's ruling on the grounds that it violated his rights under the Sixth Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Oregon statutory law. In accordance with our ordinary practice of considering state law issues before federal law issues, *see State v. Langley*, 314 Or 247, 252, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) (describing practice), we turn first to defendant's argument that the trial court violated Oregon statutes by refusing to provide interpreters that would enable prospective jurors who were not proficient in English to serve on the jury.

a. Oregon Statutes

The parties agree that the trial court excused at least one prospective juror, Montesinos, because his proficiency in English was insufficient for him serve as a juror without an interpreter, and the court had declined to appoint an interpreter for him.[6] Defendant argues that Oregon law—specifically, ORS 45.275 and ORS 45.273—requires the state to provide interpreters for prospective jurors who could serve but for their lack of proficiency in English. For the reasons that follow, we disagree with defendant's interpretation of those provisions.

---

[6] Defendant also asserts that Lamloc was excused solely because he could not participate without an interpreter. The state, however, correctly points out that Lamloc was dismissed both because of his limited English skills and because of his cognitive limitations. For that reason, the statutory and constitutional issues that defendant raises regarding the trial court's failure to provide an interpreter do not apply to Lamloc.

ORS 45.275 provides, in part:

"The court shall appoint a qualified interpreter in a civil or criminal proceeding, and a hearing officer or the designee of a hearing officer shall appoint a qualified interpreter in an adjudicatory proceeding, whenever it is necessary:

"(a) To interpret the proceedings to a non-English-speaking party;

"(b) To interpret the testimony of a non-English-speaking party or witness; or

"(c) To assist the court, agency or hearing officer in performing the duties and responsibilities of the court, agency or hearing officer."

Defendant also relies on ORS 45.273, which sets out the legislature's policy for creating procedures for the qualification and use of court interpreters. ORS 45.273(1) provides:

"It is declared to be the policy of this state to secure the constitutional rights and other rights of persons who are unable to readily understand or communicate in the English language because of a non-English-speaking cultural background or a disability, and who as a result cannot be fully protected in administrative and court proceedings unless qualified interpreters are available to provide assistance."

Nothing in the text of ORS 45.273 either authorizes or requires the provision of interpreters for non-English speakers. Rather, that statute is a general statement of a policy to "protect" the "constitutional rights and other rights" of persons who are not proficient in English "in administrative and court proceedings." That general statement is implemented by the specific provisions in ORS 45.275 and ORS 45.285 for the appointment of an interpreter for a non-English-speaking *party* in a civil or criminal case, a non-English-speaking *witness*, or a *witness* who cannot communicate because of a physical hearing or speaking impairment. *See* ORS 45.275(1)(a), (b); ORS 45.285(1)(c), (2) (so providing).

■ Apparently recognizing the absence of any specific statute regarding non-English-speaking jurors or prospective jurors, defendant argues that ORS 45.275(1)(c) requires the

appointment of an interpreter for such a person. Paragraph (c), however, provides for the appointment of an interpreter "to assist the court, agency or hearing officer" in performing their official duties. It does not mention the appointment of an interpreter to assist prospective jurors. Even assuming, without deciding, that ORS 45.275(1)(c) would *authorize* a trial court to appoint an interpreter for a non-English-speaking juror because that appointment would "assist the court," the statute nevertheless does not *require* the trial court to make such an appointment. Nothing in the statutes cited by defendant suggests that the trial court may not respond to the potential difficulties of seating a non-English-speaking juror by excusing that juror. Indeed, ORS 10.050(2) specifically provides that the trial court may "excuse a juror whose presence on the jury would substantially impair the progress of the action on trial * * *."

We conclude that the trial court's decision not to provide an interpreter for a non-English-speaking prospective juror, and its subsequent decision to exclude the prospective juror because he was unable to participate at trial without an interpreter, did not violate Oregon statutes.

b. Federal Law

Defendant next argues that the exclusion of a non-English-speaking person from the jury pool violated his Sixth Amendment right to have his jury drawn from a fair cross-section of the community.[7] Under the Sixth Amendment, a person who has been charged with a serious offense has a fundamental right to a trial by jury, *Duncan v. Louisiana*, 391 US 145, 157-58, 88 S Ct 1444, 20 L Ed 2d 491 (1968), which includes the right to trial by a jury that is drawn from a "fair cross section of the community." *Taylor v. Louisiana*, 419 US 522, 530, 95 S Ct 692, 42 L Ed 2d 690 (1975).

This court identified the elements of a "fair cross-section" claim in *State v. Rogers*, 334 Or 633, 642, 55 P3d 488 (2002):

---

[7] The Sixth Amendment to the United States Constitution provides, in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

"[T]he elements of a prima facie case, with regard to the Sixth Amendment fair cross-section requirement, require a criminal defendant to show: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Id.* at 642 (quoting *Duren v. Missouri*, 439 US 357, 364, 99 S Ct 664, 58 L Ed 2d 579 (1979) (internal quotation marks omitted)).[8]

■ Defendant advances a similar argument under the Equal Protection Clause of the Fourteenth Amendment.[9] *See Rogers*, 334 Or at 642 n 8 (summarizing requirements) (quoting *Castaneda v. Partida*, 430 US 482, 494, 97 S Ct 1272, 51 L Ed 2d 498 (1977)). There are four requirements for proving that the selection of the jury panel violates the Equal Protection Clause. *Rogers*, 334 Or at 642 n 8. First, the defendant must establish that the group is one that is a "recognizable, distinct class," singled out for different treatment under the law, as written or as applied. Second, the defendant must show the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. Third, the defendant must demonstrate that the state's selection procedure is susceptible of abuse or is not

---

[8] Although the United States Supreme Court has not defined "distinctiveness" for purposes of the fair-cross-section requirement, it has outlined three considerations consistent with that requirement's broader purpose:

"[W]e think it obvious that the concept of 'distinctiveness' must be linked to the purposes of the fair-cross-section requirement[,] * * * [which are] (1) 'guarding against the exercise of arbitrary power' and ensuring that the 'commonsense judgment of the community' will act as 'a hedge against the overzealous or mistaken prosecutor,' (2) preserving 'public confidence in the fairness of the criminal justice system,' and (3) implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.' "

*Lockhart v. McCree*, 476 US 162, 174-75, 106 S Ct 1758, 90 L Ed 2d 137 (1986) (quoting *Taylor*, 419 US at 530-31).

[9] The Fourteenth Amendment to the United States Constitution provides, in part: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

racially neutral in order to support the presumption of discrimination raised by the statistical showing. Finally, to make out an equal protection challenge, the defendant must show that the exclusion of a cognizable group is "purposeful," which requires the party to establish a clear pattern that emerges from the effect of the state's action, inexplicable on grounds other than race, even when the governing legislation appears neutral on its face. *Id.*

Defendant argues that prospective jurors who lack fluency in English are a "distinctive group," as that term is used in the fair cross-section cases and a "recognizable, distinct class," as that term is used in the equal protection cases. For example, he points out that the legislature has declared that individuals whose communication skills in the English language are deficient—because of a non-English-speaking cultural background—are such a distinctive and sufficiently cognizable class that they need to be protected in administrative and court proceedings.[10] That declaration, defendant asserts, shows that the legislature has recognized non-English-speaking persons as a distinctive and recognizable group. Defendant argues that "it is the very lack of this group's English-language proficiency that 'defines' and 'limits' it," consistent with the concerns expressed in the legislative policy statement. Defendant continues:

> "[E]xcluding those lacking English-language proficiency from jury pools in indigent criminal cases would not serve those purposes [of the fair-cross-section requirement outlined in *Lockhart*], but instead would erode the confidence of such citizens in the criminal justice system, as well as their belief that they have a civic responsibility to share in the administration of justice."

In addition to characterizing the issue as one of civic participation and legislative concern, defendant suggests, more significantly, that language is a measure of race and ethnicity. In analyzing some ethnic groups or communities

---

[10] Defendant cites the legislature's policy statement regarding interpreters, which is set out in ORS 45.273, quoted above. *See* 349 Or at 181-82. As we have discussed, no Oregon statute requires the appointment of an interpreter for a *juror* or treats non-English-speaking *jurors* as a distinctive class.

for purposes of an equal protection claim, proficiency in a particular language may be treated as a surrogate for race or ethnicity. *See Hernandez v. New York*, 500 US 352, 371, 111 S Ct 1859, 114 L Ed 2d 395 (1991) (plurality opinion) (so stating). In *Hernandez*, the plurality observed that eliminating persons who speak a particular language from a jury pool, "without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination." *Id.* at 371-72. Accordingly, defendant argues that the state's failure to provide funding for jurors who lack proficiency in English effectively excludes potential jurors from the jury pool on the grounds of language, which, in effect, excludes them on the impermissible basis of race or ethnicity.

Defendant faces a difficult hurdle in claiming that the exclusion of non-English-speaking jurors violates the United States Constitution. A federal statute provides that the ability to speak and understand English is a requirement for service on a federal jury, 28 USC § 1865(b)(2), (3), and every court that has considered the issue has upheld that requirement against constitutional challenge. *E.g.*, *United States v. Angulo-Hernandez*, 565 F3d 2, 12 (1st Cir 2009), *cert den*, ___ US ___ , 130 S Ct 776 (2009) (28 USC § 1865 does not violate fair cross-section requirement of Sixth Amendment); *United States v. Aponte-Suarez*, 905 F2d 483, 492 (1st Cir 1990) (English proficiency requirement for jury service is constitutional and serves "overwhelming national interest."). Moreover, every state court that has considered whether a requirement that jurors be proficient in English violates the Sixth Amendment, the Due Process Clause, or the Equal Protection Clause has concluded that it does not. *See, e.g.*, *State v. Gibbs*, 254 Conn 578, 597-98, 758 A2d 327, 340-41 (2000) (citing cases). Defendant does not assert that those cases were wrongly decided, nor does he explain why, if *statutes* that exclude those without English proficiency from juries are constitutional, then a state's administrative decision not to provide interpreters for jurors without English proficiency would be unconstitutional. Simply put, no case supports defendant's position.

■　Turning to the first element that is required to make out a violation of the Sixth Amendment's fair-cross section requirement—the existence of a "distinctive group"—

defendant again encounters the problem that, although numerous courts have considered the issue, no court has concluded that non-English-speaking persons constitute a distinctive group for Sixth Amendment purposes. *See Commonwealth v. Acen*, 396 Mass 472, 479, 487 NE2d 189, 194 (1986), *appeal dismissed*, 476 US 1155 (1986) (so stating). Although defendant cites *Hernandez* for the proposition that a trial judge could find that excluding jurors because they spoke a particular language was a pretext for racial discrimination, that case involved *proficiency* in Spanish, rather than lack of proficiency in English, and here, of course, the trial court made no finding of racial discrimination, pretextual or otherwise.

Even assuming, without deciding, that non-English-speaking prospective jurors constitute a "distinctive group"—and also assuming that the group is underrepresented in jury pools due to systematic exclusion—the United States Supreme Court has consistently held that states may exclude individuals who are members of such groups from juries if the exclusion is required to advance significant state interests and is no broader than necessary to serve those interests. *E.g.*, *Duren*, 439 US at 367-68 (so holding for purposes of Sixth Amendment right to jury trial). The state argues that its interests in excluding prospective jurors who are not proficient in English—including ensuring that jurors understand the proceedings at trial and are able to participate in deliberations, avoiding the disruption of having interpreters in the jury room, and not incurring the costs of providing interpreters—are compelling.

We agree that the interests articulated by the state are sufficient to justify excluding non-English-speaking persons from the jury pool. It is critical for jurors to be able to follow the proceedings in the courtroom and to be able to participate meaningfully in deliberations. The state also may reasonably conclude that the cost of providing interpreters for one or more non-English-speaking jurors is an expense that the state should not incur. Those justifications are similar to the reasons that have led every state and federal court that has considered the issue to conclude that a state permissibly may decline to provide interpreters for non-English-speaking jurors. *See Gibbs*, 254 Conn at 598-99, 758 A2d at

341; *Acen*, 396 Mass at 480, 487 NE2d at 194; *Aponte-Suarez*, 905 F2d at 492 (all so holding).

■ For similar reasons, defendant's equal protection argument also is unavailing. Even assuming, without deciding, that persons lacking proficiency in English constitute a "distinct, recognizable class" for purposes of the Equal Protection Clause, the state's strong interest in the integrity and efficiency of jury trials justifies its decision not to provide interpreters for those persons. Again, every court that has considered the issue has concluded that the exclusion of such prospective jurors does not violate the Equal Protection Clause, just as it does not violate the Sixth Amendment. *See, e.g., Gibbs*, 254 Conn at 598-99, 758 A2d at 341 (assuming non-English speakers are cognizable group for equal protection purposes, no constitutional violation because state's interests in having jurors understand proceedings and avoiding jury disruption and costs associated with interpreters are "compelling"); *State v. Garza*, 241 Neb 934, 958, 492 NW2d 32, 49 (2007) (rejecting Sixth Amendment and equal protection challenges because excluding non-English speakers from juries "promotes the interests of the state's judicial process by assuring that jurors can understand the proceedings"); *State v. Paz*, 118 Idaho 542, 552, 798 P2d 1, 11 (1990), *cert den*, 501 US 1259 (1991) (rejecting Sixth Amendment and equal protection challenges because state "has a significant interest in the integrity of the jury system * * * [which] is manifestly and primarily advanced by limiting jurors to those who are capable of understanding the proceedings").

Defendant, recognizing the absence of case law supporting his position, argues that Oregon statutes should lead to a different resolution of the federal constitutional issues. He notes that, in contrast to the federal statute and statutes in some other states requiring English proficiency to serve on a jury, Oregon does not explicitly bar non-English-speaking jurors from serving. On the contrary, defendant points to ORS 45.273(1), quoted above, as establishing a state policy "to secure the constitutional rights and other rights" of those who cannot understand English and whose rights cannot be protected "unless qualified interpreters are available to provide assistance." Defendant argues that, even if it is permissible to exclude non-English-speaking jurors by statute,

Oregon has declined to enact such a law and instead has adopted a policy in favor of interpreters that is intended to secure the rights of its non-English-speaking citizens. Therefore, the state violates a defendant's fair trial and equal protection rights by failing to provide interpreters for potential jurors who lack proficiency in English.

We disagree. As discussed above, *see* 349 Or at 181-82, no Oregon statute articulates a policy in favor of, much less requires, interpreters for non-English-speaking *jurors*, as opposed to parties to a legal proceeding or witnesses in such a proceeding. Moreover, we fail to see how an administrative or judicial decision not to fund interpreters—as long as it is applied in a nondiscriminatory manner—would violate a defendant's constitutional rights, when a statute excluding non-English-speaking jurors does not.

We conclude that the state's decision not to provide funding for interpreters for jurors who are not proficient in English does not violate the Sixth or Fourteenth Amendments to the United States Constitution.

### 2. *Exclusion of Evidence of Witness Bias (Assignment of Error Number 6)*

Defendant argues that the trial court erred in excluding evidence of bias on the part of Robert Cameron, one of the state's primary witnesses, after Cameron made a comment to defendant while Cameron was leaving the courtroom. Cameron testified during the state's case-in-chief and was extensively cross-examined with respect to the substance of his testimony and his credibility, as we discuss in greater detail below. During the defendants' case-in-chief, they presented a witness, Brown, who asserted that Cameron had told him that he had lied to prison officials about defendants' involvement in Polin's death.[11] In the state's rebuttal, it again called Cameron, and he testified briefly that he had never talked to Brown about the case. As Cameron left the stand, he allegedly made a remark to defendants, which defense counsel described to the court, outside the jury's presence:

---

[11] In turn, the state adduced testimony suggesting that Brown was lying.

"As Mr. Cameron was leaving the courtroom, he looked at our clients and maybe defense counsel as well and said: How do you like me now? And it was audible, certainly to our clients and people at counsel table. We believe the jury may or may not have heard it. We would like to make sure that the jury is informed that he made that statement."

After a colloquy, the trial court stated:

"Mr. Cameron, when he got up, I saw him look towards both Mr. Haugen and Mr. Brumwell and I don't doubt he said something. I find that to be inappropriate on Mr. Cameron's behalf. I do not find it to be any evidence of anything that the jury should hear about.

"So, you've made a record of what Mr. Cameron said. It was inappropriate. If he was here, I would tell him that, but I'm not going to allow the jury to hear it."

Defendant's attorney then said, "[T]*he jury doesn't have to hear it*, but it may indicate his bias." (Emphasis added.) Two days later, before instructions and closing argument, defendant made a *pro se* objection, arguing that certain "evidence" should have been admitted, including "Robert Cameron leaving the stand stating: How do you like me now?"

a. Preservation

 The state first contends that defendant failed to preserve his argument that the trial court erred in excluding Cameron's remark from evidence. Requiring preservation of issues at trial is important to judicial efficiency because it allows the trial court to consider legal arguments and correct the error. *State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 604, 215 P3d 847 (2009). In addition, "the preservation requirement promotes fairness to the adversary parties." *Id.* There are various levels of specificity by which an issue may be preserved for review, consistent with those purposes. *See State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998) (In analyzing preservation of error, "an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the requirement."). A party ordinarily may preserve an issue for review merely by raising an issue at trial; alternatively (and preferably), a party may preserve an issue by raising the issue, identifying a source for the party's position, and advancing a particular argument. *See State v. Hitz*, 307 Or

183, 188, 766 P2d 373 (1988) (discussing alternative methods of preserving issues for review).

Making an offer of proof ordinarily is part of preserving an argument that the trial court erred in excluding evidence. *See State v. Bowen*, 340 Or 487, 500, 135 P3d 272 (2006), *cert den*, 549 US 1214 (2007) (so stating). "The purpose of this rule [requiring an offer of proof] is to assure that appellate courts are able to determine whether it was error to exclude the evidence and whether any error was likely to have affected the result of the case." *State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988). The state argues that an offer of proof requires a party to identify the *evidence* that the party believes should have been admitted. *See State v. Busby*, 315 Or 292, 298, 844 P2d 897 (1993) (An offer of proof must identify what the evidence would have shown.). The state asserts that defendant did not make clear to the trial court what evidence defendant wanted to put on regarding Cameron's bias; defendant did not suggest that Cameron be recalled to the stand to be examined about his statement or that either of the defendants or one of the four defense counsel take the stand to testify as to the statement. Instead, defendant asked only that "the jury be informed that he made that statement." The state argues that, because defendant failed to offer any "evidentiary vehicle" for presenting evidence of Cameron's possible bias to the jury, his argument was not preserved.

We conclude that the issue was sufficiently preserved for us to consider it. After Cameron left the stand, and before the jury was excused, the trial court asked whether defendants had any further evidence. Defense counsel replied that he might have "one more witness" and wanted "a few minutes to discuss it." The jury was then excused, and defense counsel described the remark that Cameron had made when he stepped down, as quoted above. Defendant now responds to the state's argument that he did not indicate how Cameron's remark might be introduced as evidence by asserting that the reference to "one more witness" was a reference to recalling Cameron to testify about the remark if the court would permit it. Although defense counsel could have been clearer in stating to the trial court, after the jury had been excused, that he wished to recall Cameron as a witness

to testify about the remark, we believe the purposes of pres-
ervation were served by what defense counsel did say. Hav-
ing previously informed the court that he might "have one
more witness," defense counsel later stated that Cameron
had made a comment while passing the defense table and
repeated the substance of that comment.[12] He told the court
that he wanted the jury to be informed of the remark. With
knowledge that a comment had been made and what the
comment was, the trial court then ruled that it was "not going
to allow the jury to hear it."

The state also argues that defense counsel's state-
ment, after the court had ruled, that "the jury doesn't have to
hear it, but it may indicate his bias," indicates that defendant
did not disagree with the court and accepted its ruling. How-
ever, defendant's equally plausible reading of that remark
was that defense counsel was acknowledging (by repeating)
the court's unfavorable ruling ("the jury doesn't have to hear
it"), but continuing to object that the witness's statement
reflected bias and that the jury should know about it. In addi-
tion, defendant himself later stated to the trial court that the
jury should have been told of Cameron's remark. Moreover,
the trial court, immediately after ruling against defendant's
request that the jury be informed of Cameron's remark,
told defense counsel, "So, you've made a record of what
Mr. Cameron said."

As noted, it would have been preferable for defense
counsel to have requested that Cameron immediately be
recalled to the stand or to have made an offer of proof by iden-
tifying the witness he would have called and what that wit-
ness's testimony would have been, but we think, in these cir-
cumstances, that defendant sufficiently apprised the trial
court of his objection and the reasons for it. *See State v.
Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988) (citing *State v.
Foster*, 296 Or 174, 183, 674 P2d 587 (1983)) ("[A] defense
attorney does not have to walk over any more legal coals to
protect the record after first stating the grounds for the
objection.").

---

[12] Neither the trial judge nor the prosecutors heard the substance of any com-
ment by Cameron.

###### b. Exclusion of Statement

 Having concluded that defendant preserved his objection, we turn to the question whether the trial court erred in excluding evidence of Cameron's comment to defendants as he left the witness stand. Evidence of a witness's bias is generally admissible. OEC 609-1 ("The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest."); *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984) ("A principle of evidence law in Oregon is that: It is always permissible to show the interest or bias of an adverse witness." (Internal quotation marks omitted.)).

 However, our cases also make clear that, while evidence of bias is relevant and may be admitted, it is not necessarily error to exclude such evidence:

> "Evidence relevant to the bias or interest of a witness need not always be admitted. * * * Where bias or interest is shown, but further questioning is objected to, the decision is within the discretion of the trial judge."

*Hubbard*, 297 Or at 799-800. As the 1981 Conference Committee Commentary on OEC 609-1 states, although the rule permits the credibility of a witness to be attacked by evidence of conduct or statements showing bias or interest, "[t]he trial judge retains discretion to control the extent to which proof of bias or interest may go." As with other evidence, where the evidence of conduct or statements showing bias is merely cumulative of other evidence of bias, the trial court has discretion to exclude it. *See State v. Cox*, 337 Or 477, 487, 98 P3d 1103 (2004), *cert den*, 546 US 830 (2005) (trial court did not err in excluding evidence of victim's violent acts towards others to show defendant's reasons for fearing victim, because evidence, although relevant, "would not have added greatly to the evidence already before the jury").

Defendant now argues in great detail that Cameron's statement was evidence of his "animosity" towards defendants and was therefore probative of his bias against them. Accordingly, defendant asserts, the statement should have been admitted as evidence of bias under OEC 609-1. Although the state responds that Cameron's statement did

not necessarily demonstrate any particular hostility towards defendants, it also concedes that the comment might be susceptible of such a reading. If so, the statement was at least marginally relevant to the issues at trial because it tended to show Cameron's bias. Thus, it would have been permissible for the trial court to admit evidence that Cameron had made the statement. That does not mean, however, that the trial court erred in excluding evidence of the comment. As noted, our cases hold that a trial court has discretion to limit evidence of bias or interest under OEC 609-1 if it is simply cumulative of other, similar evidence of bias.

The state argues that Cameron's remark itself "was no more probative of [his general hostility towards defendants] than other evidence received at trial." Further, according to the state, because there was "ample and specific evidence" of Cameron's hostility, the admission of his comment would not have substantially assisted the jury in making a decision about his credibility.[13] We agree.

Defendant cross-examined Cameron extensively during the state's case-in-chief and sought to develop evidence that he was hostile towards defendants and biased against them.[14] The record reflects that, while testifying before the jury, Cameron was mocking, hostile, and uncooperative toward defense counsel, calling one of defendant's attorneys a "jerk off" and asserting that the attorney was trying to "peg [him] in a corner." Cameron testified that, after he had decided to testify against defendants, he received a "death contract" in the mail, threatening him and his brother. Cameron was upset with defendants for making him (as well as themselves) look guilty by committing the murder

---

[13] The state combines its argument that the trial court did not err in excluding Cameron's remark with its argument that any error was harmless. Because we conclude that it was not error for the trial court to exclude the remark, we do not address the state's harmless error argument.

[14] Defendant also sought to impeach Cameron by demonstrating, through cross-examination of Cameron and the testimony of other witnesses, that he had testified against defendants in exchange for favorable treatment in prison. Like evidence of bias, such evidence of a personal "interest" is admissible under OEC 609-1 to attack the credibility of an adverse witness. Although both "bias" and "interest" evidence relate to a witness' credibility, those kinds of evidence do so in different ways and thus evidence of bias is not cumulative of different evidence of interest.

near the band room during the time when the band in which he and they were members was scheduled to practice. Moreover, they involved him in the attempted cover-up by trying to get him to hide their bloody clothes. He thought that murdering Polin because he was a "rat" made little sense, when there were "baby killers," "child molesters," "all kinds of rats in this prison bigger than him. Why not them?" And Cameron was hostile to defendants because they had killed a friend: "I liked [Polin]. * * * And had I known that somebody was going to kill him, I would have g[iven] him a head's up, you know. I wouldn't let somebody just, you know, sneak attack. I mean, there's—I mean, for what? For nothing." In short, Cameron's direct testimony and his answers on cross-examination provided evidence of bias against defendants.

Cameron also testified that his life in prison had changed for the worse, not for the better, after coming forward to testify against defendants—testimony from which the jury could have inferred that he now bore some level of hostility towards defendants. He said that telling the authorities about defendants had "turned my life upside down" and that he now was being "treated like shit." Cameron stated that the defendants were "doing better time than I'm doing" and that he was "clearly upset" about being placed in a segregation unit after coming forward as a witness. He concluded that,

> "Since I came forward on this, I have got nothing but dicked. So, you [defense counsel] are sitting over there making all of these innuendos like I am getting something or I did this [coming forward to testify] for something. I was doing fine on my own. I didn't ask them to come to me with this shit."

Given the detailed cross-examination of Cameron and the other evidence that defendant adduced at trial to show Cameron's dislike of defendants and the multiple reasons that the jury should view Cameron's testimony with suspicion, we conclude that the trial court's decision to exclude what defendant now asserts is additional evidence of bias— Cameron's remark to defendants as he left the witness stand—was within the trial court's discretion. It was not error.

B. *Penalty Phase*

 1. *Admission of Testimony of Psychologists (Assignment of Error Number 22)*

■ Defendant argues that the trial court erred in admitting testimony from the psychologists who evaluated defendant for the parole board and in connection with the presentence investigation in the trial for his earlier murder, because that testimony did not satisfy the requirements for admitting scientific evidence. We conclude that the objection was not preserved.

■ A court may hold a pretrial hearing under OEC 104 to consider whether proposed evidence meets the standards for admission of scientific evidence set out in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and subsequent cases. *See State v. Lyons*, 324 Or 256, 260, 924 P2d 802 (1996) (conducting pretrial hearing on admissibility of scientific evidence in light of *Brown*); *State v. O'Key*, 321 Or 285, 288, 899 P2d 663 (1995) (same). Here, defendant filed a motion for an OEC 104 hearing to challenge the admissibility of the state's anticipated scientific evidence and the qualifications of certain of the state's expert witnesses. Defendant's motion requested a hearing that would cover a wide range of anticipated scientific testimony, from DNA test results to the operations of the security cameras to medical testimony concerning the victim's death. Defendant also asked that the trial court, at that hearing, consider the anticipated testimony of psychologists that would relate to the jury's determination of defendant's "future dangerousness" under ORS 163.150(1)(b)(B).

 In response to defendant's motion, the trial court issued a letter opinion in which it denied the motion for a pretrial hearing and made several rulings regarding the scientific evidence that the state intended to introduce. Two of those rulings are relevant to the testimony regarding future dangerousness. As to defendant's general request for a pretrial determination as to whether the state's proposed expert witnesses were "properly qualified to present the scientific evidence and whether they followed the scientifically valid process," the court stated that those issues did not need to be decided in advance of trial. The court noted that defendant

would be able to examine all the state's proffered expert witnesses on their qualifications and the scientific basis for their testimony—and to seek to exclude or limit their testimony—at trial.

As to defendant's specific request for a hearing "into the science behind the evidence that will be presented as to defendant's future dangerousness," the court concluded that a pretrial hearing was not required because such a hearing was premature. The trial court agreed with defendant that, if one of the state's psychologists were to offer an expert opinion as to future dangerousness, then that testimony would "be subject to the standards for scientific admissibility set forth in *Brown*." It noted, however, that the psychologists' testimony was expected to relate only to defendant's prior acts and the psychologists' evaluation of those acts; there was "no indication" that the witnesses would give an expert opinion as to "future dangerousness or the probability that [defendant] will commit future acts of violence." The trial court specifically stated, "If there is any indication that one or more of the witnesses will [give such an expert opinion], *this court will hold a hearing, outside the presence of the jury, to determine the admissibility of the proposed evidence.*" (Emphasis added.)

During the penalty phase of the trial, five psychologists discussed evaluations of defendant that they had conducted for the parole board between 1994 and 2004. One of those five also testified regarding his participation in the presentence investigation following defendant's 1981 murder conviction. Defendant made no objection at trial to the testimony of any of the psychologists on the grounds that it failed to meet the standards for scientific evidence set out in *Brown* and *O'Key*. Defendant did not object to the witnesses' qualifications, the scientific basis for their testimony, or any of their statements about defendant's psychological condition. Nor did defendant—before or during trial—disagree with the trial court's initial ruling that, if it appeared at trial that one of the experts would give an opinion as to future dangerousness or the probability that defendant would commit future acts of violence, a hearing on the admissibility of that evidence could be held at that time. On appeal, defendant now

argues that the psychologists' testimony was inadmissible because it constituted scientific evidence, but did not meet the *Brown / O'Key* standards.

We agree with the state that defendant's argument is not preserved, because he did not raise his scientific evidence objection when each of the state's witnesses testified. The trial court's pretrial ruling was clear: The psychologists who had evaluated defendant for the parole board could testify at the penalty phase; however, if those witnesses were to offer a scientific opinion as to the probability of future dangerousness, that testimony would be subject to a possible *Brown / O'Key* objection, and the court would hold a hearing on the objection at that time. Accordingly, it was incumbent on defendant to make an appropriate objection at trial.

A similar issue arose in *State v. Perry*, 347 Or 110, 218 P3d 95 (2009). The defendant had filed a pretrial motion seeking to exclude the testimony of an expert that the state intended to call on the phenomenon of "delayed reporting" in child sex abuse cases. At an OEC 104 hearing held before trial, the trial court indicated that it would allow the expert to testify, but it expressed the view that its ruling was conditioned upon the expert providing "more detail" about what was meant by "delayed reporting." *Id.* at 115-16. Moreover, the trial court's ruling, as this court noted, left the expert's testimony "subject to any specific objections that [the] defendant might make at trial." *Id.* at 116. Discussing more generally the limits of using a motion for a pretrial hearing to challenge the validity of scientific testimony, this court stated that a "general" pretrial ruling "that a certain type of evidence (even scientific evidence) is minimally relevant * * * does not relieve a party of the obligation to make specific objections to discrete pieces of that evidence at trial, if the dynamics of the trial process reveal other grounds for objection." *Id.* at 116-17.

*Perry* describes the situation here. The trial court made a general pretrial ruling that the psychologists would be permitted to testify, and it specifically reserved for trial the possibility of objections to "discrete pieces of that evidence," such as scientifically based opinion testimony on the probability of further dangerousness. Defendant therefore

had the obligation to make specific objections at trial to testimony by the psychologists that he believed should not have been admitted. Defendant failed to do so.

We also agree with the state that defendant was required to raise at trial the specific grounds for his objections to the scientific foundation for any testimony by the state's psychologists that he believed was improper. One purpose of the preservation requirement is to allow the trial court a fair opportunity to correct any potential mistakes. *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008) ("Preservation gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal."). The trial court did not bear the responsibility for remembering defendant's general objection to the psychologists' testimony, detecting such testimony when it occurred, and ruling that all, some, or none of it was appropriate, without any objection or argument having been offered by defendant. The responsibility for watching for such testimony and raising defendant's earlier objection again or making some other, more specific, objection rested with defendant's counsel. *See Perry*, 347 Or at 116 (stating rule). Moreover, as noted, before trial the trial court had not rejected all of defendant's arguments—rather, it had stated that, if the experts gave scientifically based opinion testimony, defendant could raise the issue of whether that testimony met the *Brown/O'Key* standards when the testimony was offered. If the trial court had been apprised of the objectionable testimony, the trial court, as it had agreed to do before trial, could have held a hearing—outside the presence of the jury, if necessary—to determine the admissibility of the proposed evidence. The trial court then either could have excluded the testimony, explained why it was appropriate that the jury hear it, or allowed the state to make a further record. Defendant never gave the trial court that opportunity. We conclude that the issue was not preserved for review.

2. *Consecutive Sentences (Assignment of Error Number 24)*

■ Defendant argues that the trial court erred in refusing to impose his death sentence consecutively to the life

sentence that he was already serving. The basis for defendant's argument is ORS 137.123(3), which provides:

> "When a defendant is sentenced for a crime committed while the defendant was incarcerated after sentencing for the commission of a previous crime, the court shall provide that the sentence for the new crime be *consecutive* to the sentence for the previous crime."

(Emphasis added.)

 This court determines legislative intent, in the first instance, from the text and context of the statute, and we must apply the text as the legislature has written it, particularly when the text is not ambiguous. *See State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (explaining paradigm); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993) (same). Defendant urges that, as applicable to this case, the meaning of ORS 137.123(3) is clear from the text. Defendant's sentence of death was imposed for the crime of aggravated murder, which he committed while incarcerated on a sentence of life imprisonment.[15] Under those circumstances, according to defendant, "the plain language of ORS 137.123(3) directs that the trial court '*shall provide* that the sentence for the new crime'—*i.e.*, the death sentence—'be *consecutive* to the sentence for the previous crime'—*i.e.*, the life sentence." (Emphasis supplied by defendant.) Defendant argues that the trial court erred because it did not provide that defendant's death sentence "be consecutive" to his life sentence.[16] In defendant's view,

---

[15] Defendant was serving a life sentence, but he also was eligible for parole and had had several parole hearings.

[16] The state initially asserts that defendant's argument is not ripe for review. The state maintains that the issue that defendant raises is better characterized as when defendant's death sentence will be *executed*. That issue, the state claims, will not be ripe until defendant has exhausted all post-conviction and federal habeas remedies, and the state seeks to carry out his death sentence. The state further contends that, even if the trial court erred in failing to impose the death sentence consecutively to the life sentence, neither ORS 137.123(3) nor any other statute dictates the order in which the sentences must be executed. Defendant responds that this assignment of error does not concern the execution of his sentence, but the *imposition* of the sentence of death as part of the judgment of conviction, which this court is obligated to review. *See* ORS 138.012(1) (providing for direct review in this court when jury imposes a death sentence). We agree with defendant that our automatic review of the judgment convicting defendant of aggravated murder and imposing the death penalty permits us to review defendant's claim that the judgment is inconsistent with ORS 137.123(3).

then, his death sentence cannot be carried out until he has completed his prior sentence of life imprisonment. Defendant, of course, recognizes that if his existing sentence of life imprisonment is completed only when he dies in prison, then his death sentence never can be carried out. Defendant argues that ORS 137.123(3) must be followed, despite that counterintuitive result.

The state responds that defendant's interpretation of ORS 137.123(3) is incorrect because it would require that the execution of the death sentence be delayed until the life sentence has been fully served—and therefore not be carried out at all. That result, the state argues, would conflict with the death penalty statutes. The state points out that the death penalty statutes provide that the execution of a death sentence is automatically delayed to allow for direct review by this court, the filing and disposition of a petition for *certiorari* with the United States Supreme Court, and exhaustion of collateral remedies. ORS 137.463(1); ORS 138.686. After the defendant has exhausted or waived those remedies, the trial court must hold a death warrant hearing. ORS 137.463(3), (4). Following that hearing, if the trial court determines that the defendant has exhausted or waived all remedies and is mentally competent, the court issues a death warrant that "shall specify a date [on which the death sentence is to be executed] not less than 90 days nor more than 120 days following the effective date of the appellate judgment." ORS 137.463(5). If the death sentence "for any reason * * * is not executed on the date appointed in the death warrant" and is not "stayed under ORS 138.686 or otherwise by a court of competent jurisdiction," the court must then issue a new death warrant "on motion of the state and without further hearing." ORS 137.463(7). The new warrant must specify an execution date, not more than 20 days after the date of the state's motion. *Id.* In other words, the state argues, the statutory scheme "prescribes a closed set of automatic stays and procedures that act to move the case * * * along," but does *not* permit delay of execution while the defendant completes service of another sentence.

In the state's view, ORS 137.123(3) can be harmonized with the death penalty statutes by either (1) interpreting "consecutive to" to mean only that the sentences must be

served one after another without overlap, but not in any particular order, or (2) interpreting "sentence" in ORS 137.123(3) to mean "sentence of incarceration," so that death sentences would be excluded from the statute's reach. Defendant responds that either interpretation would conflict with the text of the statute. In particular, he argues that even the state concedes that to be "consecutive to" means "following" or "right after." Thus, he argues, the new sentence must "follow" the old sentence. Additionally, defendant asserts, the legislature used the term "sentence" without qualification in ORS 137.123(3) and thus likely intended that term to include a death sentence. Further, the legislature used the phrase "term of imprisonment" in other provisions, *e.g.*, ORS 137.123(5), which demonstrates that the legislature knew how to use such a term but did not do so in ORS 137.123(3).

To the extent that the statutes conflict and cannot be reconciled, each party claims that one statute is more particular than the other. "When a general and [a] particular provision are inconsistent, the latter is paramount to the former so that a particular intent controls a general intent that is inconsistent with the particular intent." ORS 174.020(2). Defendant argues that ORS 137.123(3) applies only to sentences for aggravated murder committed while the defendant is incarcerated after the commission of a previous crime, whereas the death penalty statutes apply to all aggravated murder sentences. It follows, defendant claims, that ORS 137.123(3) is the more particular statute and that it trumps the applicable death penalty statutes. The state argues that the death penalty statutes apply only to death sentences, whereas ORS 137.123(3) applies to sentences imposed for any crime, if the defendant is incarcerated at the time of the crime, and, accordingly, the more specific death penalty statutes should be applied. The state further argues that one of the two counts of aggravated murder of which defendant was convicted was for committing a crime while confined in a correctional facility, ORS 163.095(2)(b). To give effect to the legislature's specific decision to authorize such a murder to be prosecuted as aggravated murder—with the attendant possibility that a jury will decide to impose the death penalty—ORS 137.123(3) must be interpreted to permit the imposition

of the death penalty even if a defendant is still serving a term of imprisonment.

Following the rules of statutory construction mentioned previously, we cannot give effect to ORS 137.123(3) with its requirement of consecutive sentences and, at the same time, give effect to the statutes that provide for the death penalty for an aggravated murder that is committed when the defendant is already serving a life sentence for another murder. The statutes are in conflict. In such an instance, under ORS 174.010 and ORS 174.020(2), we must give effect to all provisions or particulars of the statutes, if possible, and let the specific legislative intent control the general.

To state the obvious, the penalty of death is different in kind from incarceration. Incarceration involves the denial of freedoms and privileges through imprisonment in a state or county facility for a period of years, sometimes for the life of the inmate. By contrast, an execution is a single event at the end of a lengthy process of ensuring that the sentence of death is consistent with applicable constitutional and statutory standards. Incarceration of inmates subject solely to the death penalty is necessary only until the execution, assuming that the execution is not foreclosed by some intervening event. The two forms of punishment, particularly in a temporal sense, are not only unlike but are mutually inconsistent. To treat them as interchangeable or capable of treatment as consecutive to one another makes little sense.

The foregoing observation assists in distinguishing between general and particular legislative intent. A "particular" legislative intent is "paramount" and must "control" the general legislative intent. ORS 174.020(2). In terms of criminal law sanctions, the death penalty is the seldom-used exception to the more often-used punishment of incarceration. Moreover, it is the most severe, singular sanction that the state can impose for any crime—and it can be imposed only for one crime, aggravated murder. The statutes providing for the imposition of a sentence of death are a more specific expression of legislative intent when compared with a sentence of incarceration, because a sentence of death is

exceptional. For that reason, as previously explained, the legislature has enacted a number of specific statutes to regulate the manner in which a death sentence moves toward the issuance of a death warrant and the date of execution.

The general intent of the legislature, expressed in ORS 137.123(3), is that sentences for crimes committed in prison must be consecutive to previously imposed sentences. While consecutively adding like forms of punishment is appropriate when multiple sentences of imprisonment are involved, the penalty of death that the legislature provided for this particular crime would rarely be carried out if it is consecutive to an existing sentence of life imprisonment. The legislature has provided a timetable for carrying out the sequence of events following the imposition of a death sentence, and it is that schedule which the legislature intended trial courts and prison officials to observe. Put differently, the legislature did not intend that the schedule for imposition of a sentence of death depend on another, existing, sentence; instead, the schedule depends on the exhaustion of legal proceedings related to the aggravated murder conviction that lead to the imposition of the death penalty and the issuance of the death warrant.

We conclude that the particular legislative intent is that the sentence of death be carried out, when its imposition is consistent with proper legal standards, for aggravated murder committed in prison. *See* ORS 163.095(2)(b) (penalty for aggravated murder applies when "[t]he defendant was confined in a state, county or municipal penal or correctional facility or was otherwise in custody when the murder occurred"). If we accepted defendant's argument, the sentence of death would be contingent, rather than certain, because the state would have to wait for the completion of defendant's life sentence before executing the death sentence. That result would be inconsistent with the legislature's more specific intent that the death penalty may be imposed for aggravated murders committed in prison. Defendant must continue to serve a period of life imprisonment while he is confined awaiting the execution of the sentence of death. Pursuant to the legislature's intent, the period of imprisonment for defendant's earlier crime runs until such

time as the sentence of death for aggravated murder is carried out according to the schedule determined by statute. We reject defendant's argument that the execution of the death sentence must be imposed only after he has served his life sentence.

## III. CONCLUSION

As previously noted, we have considered defendant's other assignments of error, and we conclude that they are unpreserved, are disposed of by prior rulings of this court, or, as argued, are without merit. In our view, discussion of those assignments would not benefit the bench, bar, or public.

The judgment of conviction and the sentence of death are affirmed.

**DE MUNIZ, C. J.,** concurring.

With one exception, I concur in both the reasoning and the result of the majority's opinion in this case. The exception involves the sixth assignment of error, which dealt with the alleged statement "How do you like me now?" by witness Robert Cameron as he was stepping away from the witness stand. The majority concludes that the alleged error was preserved, but concludes that, even assuming Cameron's statement was evidence of bias, the trial court did not err in refusing to admit the evidence. 349 Or at 189-95. In my view, defendant failed to preserve any error regarding Cameron's alleged statement. I, therefore, would not reach the merits of the assigned error.[1]

The pertinent facts are correctly set out in the majority opinion. After Cameron had left the witness stand—and after the court had taken a recess—defense counsel informed the court that, as Cameron was leaving the witness stand, he

---

[1] Because I would not reach the merits of the assigned error, I am not required to express an opinion about the correctness of the majority's conclusion regarding the trial court's ruling. I note in passing, however, that the witness's expressed defiance of defendant (if it actually occurred), while it might have a benign or insignificant impact on a jury, also could be seen as an outburst of animosity that had finally found an outlet. If the latter, I think that a reasonable juror could have considered it the pivotal piece of evidence concerning the witness's credibility, and a valid reason to question that credibility.

had stated "How do you like me now?" loud enough for counsel and co-counsel to hear the statement. The judge and the prosecutor both indicated that they had not heard it. Defense counsel stated that he "would like to make sure that the jury is informed that he [Cameron] made that statement." Defense counsel did not request that Cameron be retained as a witness and counsel did not attempt to recall Cameron to the witness stand. Neither did defense counsel offer to call any other witness to the statement. The substance of defense counsel's offer of proof was the assertion that the statement had been made and a request that the jury be "informed" about it.

It has long been the preferred practice in this state that offers of proof ordinarily be made by questioning a witness outside the presence of the jury, not by counsel summarizing the expected testimony. "Unless the calling of witnesses is waived by the court or by the adverse party, we think the better practice is to call the witnesses relied on and ask appropriate questions." *Columbia R. I. Co. v. Alameda L. Co.*, 87 Or 277, 291, 168 P 64 (1917), *on reh'g,* 168 P 440 (1918); *see Ashmun v. Nichols*, 92 Or 223, 178 P 234, *on reh'g,* 180 P 510 (1919) (quoting *Columbia* with approval). Offers of proof involving the mere "avowals of counsel" often are problematic. *See Null v. Siegrist*, 262 Or 264, 267, 497 P2d 664 (1972) (evidentiary hearing conducted outside presence of jury "was in the nature of an offer of proof and, assuming that plaintiff did change doctors for the reason his counsel indicated, he should have so testified" (footnote omitted)); *First Nat. Bank v. Oregon Paper Co.*, 42 Or 398, 402, 71 P 971 (1903) ("If the appellants were not allowed to prove their claims, they should have called witnesses, and stated to the court the testimony which it was expected would be elicited from them, and upon a refusal to receive such testimony take an exception." (Citation omitted.)).

Here, defendant made no effort to recall Cameron, and defendant offered no additional witness to testify to what was said. Defendant merely asked that the jury be "informed" about the statement. Simply put, there was no

offer of proof, because defendant did not *offer* to *prove* anything. Requesting that the court inform the jury of a statement that the court did not even hear is not sufficient to preserve the evidentiary error, and this court errs in concluding otherwise.

Although I concur in the majority's decision to reject defendant's sixth assignment of error, I do so only because the error was not preserved.

Gillette and Durham, JJ., join in this concurring opinion.