TOOKEY, J.
*500 Petitioner was convicted of aggravated murder and sentenced to death. See generally State v. Haugen , 349 Or. 174, 243 P.3d 31 (2010) (setting forth facts underlying petitioner's and co-defendant Haugen's convictions); State v. Brumwell , 350 Or. 93, 249 P.3d 965 (2011), cert. den. , 565 U.S. 1124, 132 S.Ct. 1028, 181 L.Ed.2d 757 (2012) (setting forth facts regarding penalty phase of petitioner's criminal trial). After petitioner's conviction and sentence of death were affirmed by the Supreme Court on direct appeal, id. at 112, he petitioned for post-conviction relief, contending, among other points, that his trial counsel rendered inadequate and ineffective assistance of counsel. The post-conviction court denied post-conviction relief as to the guilt phase of petitioner's criminal trial and granted post-conviction relief as to the penalty phase.
*664 On appeal, in his first through third assignments of error, petitioner contends that the post-conviction court erred in failing to conclude that his trial counsel rendered ineffective and inadequate assistance during the guilt phase of his criminal trial. Among other arguments, petitioner contends that his trial counsel failed to (1) "perform a reasonable, independent investigation of the prosecution's blood spatter evidence," (2) "perform a reasonable, independent investigation of the prosecution's main prison informant Robert Cameron's motives to lie," (3) "investigate and develop evidence that petitioner was 'standing jigs' as a lookout for [a] tattoo session" at the time of the victim's death, and (4) "choose and present a reasonable theory of defense." For the reasons that follow, we affirm.[1]
We review judgments granting or denying post-conviction relief for errors of law. Heroff v. Coursey , 280 Or. App. 177, 179, 380 P.3d 1032 (2016), rev. den. , 360 Or. 851, 389 P.3d 1140 (2017). "In doing so, however, we are bound by the post-conviction court's findings of fact if they are supported by evidence in the record." Id. (internal quotation marks and citations omitted). "If the post-conviction court failed to make findings of fact on all the issues-and there is evidence from *501 which such facts could be decided more than one way-we will presume that the facts were decided consistently with the post-conviction court's conclusions of law." Id. (internal quotation marks and citations omitted).
I. THE UNDERLYING CRIME AND PROCEDURAL BACKGROUND
Evaluating petitioner's post-conviction claim requires an understanding of the events underlying petitioner's prosecution, the defense and prosecution theories at trial, and the evidence presented at trial. Accordingly, we first summarize the facts concerning the underlying crime-a murder committed at the Oregon State Penitentiary (OSP)-which we largely draw from the Supreme Court's opinions in Haugen and Brumwell, 350 Or. at 95 , 249 P.3d 965 (noting "[t]he facts relating to the inmate's murder and the joint guilt phase of defendant's trial are set out in [ Haugen ]"), but supplement as necessary to analyze petitioner's arguments on appeal.[2] We then briefly discuss petitioner's underlying criminal trial, direct appeal, and the post-conviction proceeding. In our analysis of petitioner's arguments in this appeal, we provide additional facts and procedural details that are relevant to each particular argument.
A. The Underlying Crime
In 1996, petitioner was sentenced to life imprisonment without the possibility of parole for the aggravated murder of one person and the attempted aggravated murder of another. In 2003 he was serving that sentence at OSP. His codefendant in the guilt phase of the underlying criminal trial, Gary Haugen, was also serving a life sentence for murder. Petitioner, Haugen, and another inmate, Robert Cameron, played together in a band at OSP.
In August 2003, petitioner and Haugen suspected that someone was informing prison officials about their drug use. Prisoners had noticed that prison officials usually administered drug tests during the week. Accordingly, prisoners timed their drug use for weekends so that they could produce a clean urinalysis during the week. In a deviation *502 from the ordinary timing, on Saturday, August 23, 2003, prison officials gave a drug test to a friend of petitioner's, inmate Christopher Lawrence, which identified him as having used drugs. On Sunday, August 31, 2003, prison officials gave a drug test to petitioner and Haugen.[3] Petitioner and Haugen *665 were upset about the drug tests and suspected the presence of an informant. They believed, incorrectly, that the victim, David "Sleepy" Polin, was the informant.
On September 1, 2003, the day after petitioner's and Haugen's drug test, an inmate overheard either petitioner or Haugen say "we've got to get him," referring to the victim. The inmate then saw petitioner walk toward the victim clenching his fist until Haugen stopped petitioner and said, "Stop, not here."
The next day-September 2, 2003-shortly after 9:00 a.m., the victim's body was found in the band room of the activities section of OSP. The victim had sustained 84 stab wounds and a blunt-force trauma to the head resulting in a skull fracture. The victim's hands reflected wounds that appeared to have been suffered in defending himself against an attack. The attack had occurred in an alcove outside the band room, which was smeared with blood. Subsequently, the victim's body had been dragged into the band room. The victim's blood also was found in a trash can just outside the alcove. Inside the trash can was a t-shirt soaked with the victim's blood, one of his shoes, his inmate identification, bloody rags, and a large threaded metal rod with the victim's blood on it. The rod was part of a stool from the band room. Two "shanks" or homemade knives also were found in the vicinity; one in the drain of a nearby bathroom and one outside the bathroom window. Strands of petitioner's hair were found on the victim's clothing.
Security cameras captured images of petitioner and Haugen, shortly before and after 8:00 a.m. Images from several cameras at different locations in the activities section showed petitioner, Haugen, and the victim in the general area near the band room in the minutes before the attack.
*503 The images showed petitioner and Haugen repeatedly visiting the nearby bathroom, in which one of the shanks later was found, and then showed Haugen shortly before the attack with an oddly shaped item concealed under his t-shirt, possibly the metal rod from the stool. Another camera was located in the band room. That camera showed petitioner and Haugen dragging the victim's body into that room. Images from the camera also showed movement through a window in the door to the alcove, just before petitioner and Haugen dragged the body into the band room. Images taken shortly after the attack showed petitioner and Haugen leaving the area and wearing at least some different clothing than they had been wearing 15 minutes earlier.
The day of the murder was "shower" day, when inmates take showers and exchange their clothing. During petitioner's trial, an inmate testified that he observed Haugen in the shower clipping his fingernails with fingernail clippers and scrubbing his fingernails with a toothbrush, and that Haugen's hands were soiled by some dark substance. The inmate also testified that he saw petitioner, whose hands were also soiled, doing the same after Haugen handed him the fingernail clippers and toothbrush, and that the dark substance turned red as petitioner washed. In a clothing bin in the shower area, police recovered pants and t-shirts, stained with the victim's blood, matching the sizes worn by petitioner and Haugen. One pair of pants had DNA material in the thigh area matching Haugen's DNA; those pants also had a splatter pattern of liquid that matched the victim's blood. The victim's blood was also found on a pair of shoes belonging to petitioner.
Later that day, a detective examined petitioner and observed that petitioner had a scratch on his neck and two "minor injuries" on the back of both of his hands.
Subsequently, petitioner and Haugen were each charged with one count of aggravated murder for committing murder after previously having been convicted of murder, ORS 163.095(1)(c), and one count of aggravated murder for committing murder while confined in prison, ORS 163.095(2)(b).
*504 B. The Underlying Trial and Direct Appeal
As noted above, petitioner and Haugen were tried together in the guilt phase of their criminal trial. Before that trial, petitioner, Haugen, and their respective counsel, entered into a joint defense agreement to, among other things, memorialize their understanding *666 that during the trial there would not be "finger pointing" between them.
At trial, the state's theory was that petitioner and Haugen had "lured" the victim to the band room to kill him because they believed that the victim was an informant. Petitioner's and Haugen's strategy was, essentially, to argue that the state had failed to prove its case, and petitioner's trial counsel attempted to "distance [petitioner] as much as [they] could from the activity outside the band room."
The state's evidence at trial included (1) the testimony of a forensic scientist, Jennifer Riedel, who testified regarding the blood stains on petitioner's shoes, and (2) the testimony of Cameron, who testified that petitioner and Haugen had both confessed to killing the victim shortly after the murder had occurred.
A jury found petitioner and Haugen each guilty of two counts of aggravated murder, and petitioner was sentenced to death. Petitioner appealed to the Supreme Court, which affirmed petitioner's conviction and sentence of death. Brumwell , 350 Or. at 112, 249 P.3d 965.
C. The Post-Conviction Proceeding
Following the Supreme Court's rejection of petitioner's direct appeal, petitioner filed the instant action for post-conviction relief. As discussed further below, at the post-conviction proceeding, petitioner introduced, among other evidence:
• testimony from Riedel regarding bloodstain pattern analysis and the opinions that she presented during petitioner's underlying criminal trial, which petitioner points to in support of his argument that trial counsel failed to "perform a reasonable, independent investigation of the prosecution's blood spatter evidence";
*505 • affidavits from other inmates stating that Cameron owed gambling debts that he could not pay and thus "had a motive to be placed in protective custody, for his safety[,] as well as to walk away from his debts," which petitioner points to in support of his argument that trial counsel failed to "perform a reasonable, independent investigation of the prosecution's main prison informant Robert Cameron's motives to lie";
• affidavits from other inmates stating that Haugen intended to get a tattoo from the victim on the day of the murder and that petitioner was observed "standing jigs"-i.e. , standing lookout-around the time of the murder, as well as testimony from petitioner's trial counsel concerning petitioner's trial strategy, which petitioner points to in support of his arguments that his trial counsel failed to (1) "investigate and develop evidence that petitioner was 'standing jigs' *** for [a] tattoo session at the time" of the killing and (2) "choose and present a reasonable theory of defense"-viz. , that petitioner was acting as a lookout for a tattoo session between Haugen and the victim, and that petitioner's "participation was at most limited to helping to move an already dead body and helping to clean up."
As noted above, the post-conviction court granted post-conviction relief as to the penalty phase of petitioner's trial but denied it as to the guilt phase. With respect to the guilt phase, the post-conviction court found, in pertinent part:
"[Petitioner] and Mr. Haugen were friends within [OSP] and they shared similar interests and beliefs. Although there was no video tape evidence of the actual murder, there was video of Mr. Haugen and [petitioner] moving Mr. Polin's body to the location where it was discovered. Additionally[,] there was blood stain and hair evidence tying [petitioner] to Mr. Polin's body. Following his arrest for aggravated murder in the death of Mr. Polin, [petitioner] was appointed Mr. Storkel who requested Mr. Brownlee be appointed as co-counsel. Mr. Storkel then put together the rest of the team.
*506 "From the very beginning, [petitioner] made it clear that he and Mr. Haugen were in this trial together and neither would testify or in any way point the finger at anyone. There was abundant evidence *667 that [petitioner] was totally immersed in what he called 'the law of the land' and others called 'the code of the con'. He would allow no testimony or defense that pointed toward Mr. Haugen committing the acts resulting in the death of Mr. Polin or implicated him in any way. That left Mr. Storkel with the only possible defense of while [petitioner] helped move the body the state would have to prove who actually killed Mr. Polin. The discovery shows that the defense team discussed using self-defense, [petitioner] would not agree. Given [petitioner's] strongly held position, there were few options other than the approach taken by his attorneys. Motions were discussed with [petitioner] and it was clear from the testimony during this hearing and in the pages of discovery, that they were prepared to change course if at any time [petitioner] indicated a desire to take a different position. He never did.
"* * * * *
"Given the position [petitioner] held during the trial, his attorneys made the best decisions available to them. No additional witnesses, tests or arguments were going to be used given the defense [petitioner] insisted upon. It is [petitioner's] obligation in this matter to offer evidence supporting his individual claims. In the guilt phase of his trial, there is not a sufficient showing to find ineffective assistance of coun[sel] on any of his claims."
The post-conviction court issued a judgment reflecting that, with respect to the claims for relief that are the subject of this appeal, "[p]etitioner did not carry his burden to prove [ (1) ] the merits of th[ose] claim[s] and [ (2) ] that he suffered prejudice as a result that would warrant post-conviction relief."
II. ANALYSIS OF PETITIONER'S APPEAL
" Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the constitutional right to 'adequate' representation." Sparks v. Premo , 289 Or. App. 159, 168, 408 P.3d 276 (2017), rev. den. , 363 Or. 119, 421 P.3d 354, cert. den. , --- U.S. ----, 139 S. Ct. 569 (2018). "Similarly, the Sixth Amendment to the United States Constitution guarantees the right to *507 'effective' assistance of counsel." Id. (citing Strickland v. Washington , 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984) ). Although we interpret and apply Article I, section 11, independent of the Sixth Amendment, "the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." Johnson v. Premo , 361 Or. 688, 699, 399 P.3d 431 (2017) (internal quotation marks omitted).
Under Article I, section 11, "[t]o demonstrate that he is entitled to post-conviction relief, petitioner must show that counsel failed to exercise reasonable professional skill and judgment, and that petitioner suffered prejudice as a result of counsel's inadequacy." Sparks , 289 Or. App. at 169, 408 P.3d 276. The pertinent inquiry under the Sixth Amendment is whether counsel's performance "fell below an objective standard of reasonableness" and whether the deficiencies in counsel's performance "prejudiced" the defense. Strickland , 466 U.S. at 687-88, 692, 104 S.Ct. 2052.
Under Article I, section 11, "the exercise of reasonable professional skill and judgment generally requires an investigation that is legally and factually appropriate to the nature and complexity of the case so that the lawyer is equipped to advise and represent the client in an informed manner." Stevens v. State of Oregon , 322 Or. 101, 108, 902 P.2d 1137 (1995). Under the Sixth Amendment, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland , 466 U.S. at 691, 104 S.Ct. 2052. In determining whether counsel failed to exercise reasonable professional skill and judgment, "we 'make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight.' " Sparks , 289 Or. App. at 169, 408 P.3d 276 (quoting Lichau v. Baldwin , 333 Or. 350, 360, 39 P.3d 851 (2002) ). "Accordingly, we do not 'second guess a lawyer's tactical decisions in the *668 name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment.' " Id. (quoting Gorham v. Thompson , 332 Or. 560, 567, 34 P.3d 161 (2001) ). "In fact, the test 'allows for tactical choices that backfire, because, *508 by their nature, trials often involve risk.' " Id. (quoting Krummacher v. Gierloff , 290 Or. 867, 875, 627 P.2d 458 (1981) ). "Further, a defendant does not have a constitutional right 'to a perfect defense-seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided.' " Id. 169-70 (quoting Krummacher , 290 Or. at 875, 627 P.2d 458 ). "Nevertheless, the Supreme Court has also noted that, in cases where the petitioner was charged with aggravated murder and the state sought the death penalty, 'no type of criminal case requires more care in preparation.' " Id. at 170 (quoting Johnson , 361 Or. at 701, 399 P.3d 431 ).
Under Article I, section 11, in determining whether a petitioner suffered prejudice as a result of counsel's inadequacy, "we evaluate whether petitioner demonstrated that counsel's failure had a tendency to affect the result of his trial." Id. (citing Lichau , 333 Or. at 359, 39 P.3d 851 ). The "question for the court is not simply whether counsel's failure had any negative effect regarding a particular issue. Rather, the question is whether the negative effect, if any, as to that issue in turn tended to affect the result in the proceeding as a whole." Derschon v. Belleque , 252 Or. App. 465, 474, 287 P.3d 1189 (2012), rev. den. , 353 Or. 208, 297 P.3d 480 (2013) (internal quotation marks and brackets omitted); see also Richardson v. Belleque , 362 Or. 236, 268, 406 P.3d 1074 (2017) (concluding that petitioner established prejudice where "there was more than a mere possibility that counsel's [deficient representation] could have tended to affect the outcome of the dangerous-offender proceeding"). Under the Sixth Amendment, we evaluate whether "there is a reasonable probability that the result of the proceeding would have been different." Sparks , 289 Or. App. at 170, 408 P.3d 276 (citing Strickland , 466 U.S. at 694, 104 S.Ct. 2052 ).
A. Trial Counsel's Purported Failure to Perform a Reasonable, Independent Investigation of the Prosecution's Blood Spatter Evidence
As noted above, on appeal, petitioner contends that his trial counsel were inadequate and ineffective because they failed to perform a reasonable, independent investigation of the prosecution's "blood spatter evidence."
*509 We begin by summarizing the evidence and argument from the underlying criminal trial, as well as the evidence adduced at the post-conviction proceeding, that is relevant to petitioner's contention. During petitioner's criminal trial, the state called Riedel, who testified regarding the blood stains on petitioner's shoes. In particular, she testified that (1) the blood on the "left lateral toe portion" of the left shoe was a "impact" "spatter pattern," which meant it was formed by "free-flying drops" of blood, (2) for such a pattern to exist the shoe would have had to "be in an environment where blood had been spattered with a good amount of force behind it," (3) one possibility for how the blood spatter got on the shoe is that it was "expirated," (4) the kind of spatter on the left shoe would not come from merely "walk[ing] through a scene," and (5) "there can be *** different events that can cause a spatter that looks similar." She also testified that a blood stain near the victim's head was "spatter." During cross-examination, she acknowledged that it was "possible" that others in her field might disagree with her interpretation.
To rebut Riedel's testimony, petitioner's trial counsel called Gary Knowles, a forensic scientist who had been retained by Haugen's defense counsel. Knowles testified regarding bloodstain pattern analysis generally and the bloodstains on petitioner's left shoe specifically. Knowles testified that his "first impression" of the blood on petitioner's left shoe was that it was "blood into blood," but also noted that it could be "stomped blood."[4] He *669 also testified that "expirated" blood could be caused by "a body being dropped" and could be caused "whether a person was alive or dead."
During the state's closing argument, the prosecution characterized Riedel's testimony regarding the blood spatter on petitioner's shoe as indicating that petitioner was present when the victim was killed:
"The same blood spatter that's at the scene is on [petitioner's] shoe. It's on the left shoe there. Very important, folks.
*510 "Remember that blood spatter on that shoe. Jennifer Riedel told you how that gets there. It gets there by being in a place where blood is coming out of someone's body. You don't get that by walking through a bloody crime scene. The only way that gets there is by being there when the murder happened."
Subsequently, Haugen's trial counsel argued that the prosecution's characterization of Riedel's testimony was not accurate, and presented an alternative theory for what caused the bloodstain on petitioner's shoe-viz. , that it was caused by petitioner and Haugen dropping the victim's body after moving it:
"[T]he idea that was characterized by the state that that spatter had to be at the scene when the impacts were happening was not what Jennifer Riedel said and definitely not what Gary Knowles said. ***
"Now, Jennifer Riedel favored the theory that it was some sort of cast-off of expectorated blood and Gary Knowles agreed that that could be it. But he, who had much more experience, longer experience, was a crime lab director-he said: Wait a minute. If you drop a body from 2 or 3 feet up or whatever it takes to do that, there's plenty of blood to do that. That's consistent. Or blood on blood.
"* * * * *
"So, for the district attorney to say Jennifer Riedel told you that that blood only gets there by being there when the murder happens, that absolutely mischaracterizes, I think, what Jennifer Riedel told you folks and told us all. And further, using words like, she told you there was only one way, it was the only way, it was absolute-that's not the same testimony that I heard, and I hope it's not the same testimony that you heard."
Haugen's trial counsel further noted that Riedel could not say with "scientific certainty" that what she was identifying as "direct blood spatter" was, in fact, "direct blood spatter."
Petitioner's trial counsel, for his part, argued that Riedel's testimony was not reliable, contending that Riedel acknowledged that there were "a number of different theories" regarding the blood on petitioner's shoe, and that "[s]he just picks one * * * that's helpful to the state." He also noted *511 that Knowles had testified that his "first impression" was that the stain was "blood on blood."
During the post-conviction proceeding, petitioner called Riedel as a witness. Riedel testified that there was "impact spatter" on the carpet near the victim's head, likely caused by the victim's head hitting "that blood pooled area." Riedel also testified that she was aware of a type of bias in bloodstain pattern analysis, which petitioner has termed "context bias," whereby information about a particular case may influence how someone analyzing bloodstains might come to a conclusion, and that to help control for that bias her analyses were always "technically reviewed by another competent examiner, as well as *** reviewed by the supervisor." She also testified that she was aware of a type of bias called "confirmation bias," whereby the person reviewing her analyses might be influenced by her conclusion. She noted that that sort of bias is "inherent" in peer review.
Petitioner's post-conviction counsel also sought to impeach Riedel with a document-the National Research Council's report on Strengthening Forensic Science in the United States-which led to the following exchange:
"Q. Do you agree with the statement that, in general, the opinions of bloodstain pattern analysts are more subjective than scientific?
"A. Yes, I do-Well, in part. There's definitely a subjective component, but that's not to say that there's no objectivity."
*670 Petitioner's post-conviction counsel also asked Riedel if she would "change or rephrase any of the testimony that [she] gave" in light of a "report" regarding aspects of bloodstain pattern analysis, to which Riedel replied:
"A. No. I wouldn't.
"In reviewing my testimony, I did observe that, based on the questions-based on the questions that I was asked, I gave the answers that I felt were appropriate, and I still do. I do wish, though, that some aspect-some questions had been asked a little more clearly to express, for instance, that it might be impact or that it could be expectorated."
*512 On appeal, petitioner argues that, "[w]ith proper investigation, * * * Riedel's 'impact' spatter testimony [during petitioner's criminal trial] would have been shown to not be conclusive." More specifically, petitioner first argues that, with a proper investigation, trial counsel's cross-examination of Riedel would have been more thorough and effective. To support that argument he points to, among other evidence adduced during the post-conviction proceeding, (1) Riedel's testimony, discussed above, regarding "context" and "confirmation" bias, and (2) what petitioner characterizes as Riedel's agreement "with the proposition that blood stain pattern analysis was 'more subjective than scientific.' "
Second, petitioner argues that a reasonable investigation "would have provided evidence and enabled argument that the 'impact' spatter stain on the shoe could have been caused when petitioner moved the body and deposited it on to the carpet." Petitioner notes that, during the post-conviction proceeding, Riedel testified that there was an "impact spatter" stain near the victim's body which was likely caused when the victim's body was deposited and that Riedel did not "identify any distinguishing features that would exclude [petitioner moving the victim's body] from causing the stain on petitioner's left shoe."
The superintendent argues that the post-conviction court correctly rejected petitioner's claim that his trial counsel failed to provide constitutionally adequate assistance for not successfully challenging Riedel's opinion. The superintendent notes that Riedel, during the post-conviction proceeding, did not "back down" from the opinion that she gave at petitioner's criminal trial that the blood stain on petitioner's shoes could either be impact or expirated blood, and that petitioner failed to present "any affirmative evidence *** that the opinion that Riedel gave at trial about the nature of the bloodstain on the footwear he had been wearing was incorrect."
We conclude that the post-conviction court did not err in concluding that petitioner was not entitled to post-conviction relief with respect to his claim that his trial *513 counsel was inadequate and ineffective for failing to conduct a reasonable, independent investigation of the prosecution's blood spatter evidence.
With respect to petitioner's first argument, regarding his trial counsel's purportedly deficient cross-examination of Riedel, even assuming that trial counsel's cross-examination of Riedel was somehow deficient-an issue we do not decide-petitioner has failed to demonstrate that that purported deficiency caused him prejudice, because the jury was aware that the blood stain on petitioner's shoe was not "conclusive evidence" that petitioner was at the scene when the murder occurred, and we do not believe that the additional evidence adduced at the post-conviction proceeding to that end would have discredited Riedel. See Burcham v. Franke , 265 Or. App. 300, 316-17, 335 P.3d 298 (2014) (no prejudice from failure to introduce testimony during rape trial from a medical expert that a skin tear could have occurred by means other than penetration because the jury "had already been informed that the skin tear was not conclusive evidence of penetration," and it was therefore "reasonable for the post-conviction court to conclude that additional testimony on that point would not have discredited" the state's witness).
More specifically, as noted above, contrary to petitioner's contention, Riedel did not testify during petitioner's criminal trial that the blood on petitioner's shoe was conclusively "impact spatter" or conclusive evidence that petitioner was at the scene when the murder *671 occurred. Instead, Riedel testified that the blood on petitioner's shoe could be either impact or expirated, that it did not get on the shoe by petitioner merely "walk[ing] through a scene," and "there can be *** different events that can cause a spatter that looks similar." While the prosecutor characterized Riedel's testimony as conclusive evidence that petitioner was present when the murder occurred, that characterization of Riedel's testimony was squarely and adequately addressed by petitioner's and Haugen's trial counsel during their respective closing arguments.
Moreover, at petitioner's criminal trial, Riedel acknowledged the limitations of her opinions, testifying that *514 others in her field might disagree with her interpretation, and petitioner's trial counsel presented evidence, through Knowles, that the blood stain on petitioner's shoe could be "blood on blood" or "stomped blood." Additionally, during the post-conviction proceeding, even after petitioner's attempt to impeach Reidel, Reidel testified that she would not change or rephrase the testimony she gave at petitioner's trial. See Burcham , 265 Or. App. at 315-16, 335 P.3d 298 (noting "when a petitioner's claim for relief involves an argument about how a witness might have testified at trial, it is incumbent on the petitioner to provide evidence *** as to what the testimony would have been so as to allow an evaluation of the likely effect of that testimony at trial" (internal quotation marks and brackets omitted)).
As a result, petitioner has not demonstrated that he was prejudiced by his trial counsel's failure to adduce evidence regarding "context" and "confirmation" bias, or evidence that there is a "subjective component" to blood spatter analysis. Plainly put, the jury was aware that the blood stain on petitioner's shoe was not conclusive evidence that petitioner was at the scene when the murder occurred, and the additional evidence adduced at the post-conviction proceeding regarding "context" or "confirmation" bias and subjectivity would not have discredited Riedel. For that reason, petitioner has not demonstrated that trial counsel's alleged deficient cross-examination of Riedel had a tendency to affect the result of petitioner's criminal trial or that there is a reasonable probability that the result of petitioner's criminal trial would have been different absent that alleged deficiency.
With respect to petitioner's second argument, that a reasonable investigation "would have provided evidence and enabled argument that the 'impact' spatter stain on the shoe could have been caused when petitioner moved the body and deposited it on to the carpet," even assuming trial counsel's investigation was somehow deficient-an issue we do not decide-we are not persuaded that petitioner was prejudiced by his trial counsel's failure to make such an argument. At trial, an adequate argument was advanced by trial counsel to address the state's argument that the *515 bloodstain on petitioner's shoe conclusively placed petitioner at the scene of the murder-viz. , that the bloodstain on petitioner's left shoe was "blood on blood" and was caused when petitioner and Haugen deposited the victim's body in the band room. That argument had the benefit of being consistent with the testimony given by the expert called by petitioner's trial counsel-viz. , that his first impression was that the bloodstain on petitioner's left shoe was "blood into blood." Petitioner does not convincingly explain why his proffered "impact spatter" argument is better than the "blood on blood" argument made by trial counsel. As a result, he has not demonstrated trial counsel's failure to make an "impact spatter" argument had any tendency to affect the result of his criminal trial or that there is a reasonable probability that the result of the criminal trial would have been different had such an "impact spatter" argument been made.
In light of our analysis above, we conclude that the post-conviction court did not err in denying petitioner's claim for post-conviction relief with respect to trial counsel's purported failure to perform a reasonable, independent investigation of the prosecution's blood spatter evidence.
B. Trial Counsel's Purported Failure to Perform a Reasonable, Independent Investigation of Cameron's Motive to Lie
As noted above, on appeal, petitioner contends that his trial counsel were inadequate *672 and ineffective because they failed to perform a reasonable, independent investigation of Cameron's motives to lie. Petitioner asserts that, with an adequate investigation, trial counsel would have discovered witnesses who would have been willing to testify that Cameron (1) owed gambling debts that he could not pay and (2) consequently, had "motive to lie and motive to testify for the state in order to receive a transfer to another prison."
Again, we begin by summarizing the evidence and argument from the underlying criminal trial, as well as the evidence adduced at the post-conviction proceeding that is relevant to petitioner's contentions. During petitioner's criminal trial, the state called Cameron as a witness. Cameron testified that petitioner had admitted to Cameron *516 that petitioner had killed the victim. Cameron also testified that Haugen had admitted to Cameron that (1) Haugen had attacked the victim in the alcove outside the band room, (2) Haugen had stabbed the victim 30 times, (3) Haugen had hit the victim with a "drum chair" from the band room and had "caved his fucking head in," and (4) Haugen had killed the victim because the victim was a "rat."
In addition to testimony regarding petitioner's and Haugen's admissions, Cameron testified that (1) although the band usually practiced on Tuesday mornings, Cameron did not go to the activities section the morning of the murder because petitioner had told him that another band had taken their time slot, which was not true, (2) petitioner had asked Cameron to locate petitioner's jacket in a laundry cart and rip out the state identification number, (3) petitioner had said that his jacket had a "t-shirt lining," rather than the usual flannel lining, (4) Cameron found such a jacket that had a dark stain on it that appeared to be blood, and (5) Cameron did not remove the state identification number as petitioner had asked, instead, he hid the jacket under a yellow raincoat. Police later recovered a bloodstained jacket bearing petitioner's state identification number from under a yellow raincoat and identified the blood on the jacket as the victim's.
Cameron also testified that he saw Haugen and petitioner take off their shower sandals and put them in a bag and, when Cameron asked them about that, petitioner said something about blood. Sandals were later recovered by police.
During petitioner's criminal trial, Cameron was "cross-examined *** extensively," and petitioner and Haugen "sought to develop evidence that he was hostile towards defendants and biased against them." Haugen , 349 Or. at 194, 243 P.3d 31 (so noting with respect to Haugen's trial counsel's cross-examination of Cameron). The record reflects that,
"while testifying before the jury, Cameron was mocking, hostile, and uncooperative toward defense counsel, calling one of [Haugen's] attorneys a 'jerk off' and asserting that the attorney was trying to 'peg [him] in a corner.' Cameron testified that, after he had decided to testify against *517 defendants, he received a 'death contract' in the mail, threatening him and his brother. Cameron was upset with defendants for making him (as well as themselves) look guilty by committing the murder near the band room during the time when the band in which he and they were members was scheduled to practice. Moreover, they involved him in the attempted cover-up by trying to get him to hide their bloody clothes. He thought that murdering Polin because he was a 'rat' made little sense, when there were 'baby killers,' 'child molesters,' 'all kinds of rats in this prison bigger than him. Why not them?' And Cameron was hostile to defendants because they had killed a friend: 'I liked [Polin]. *** And had I known that somebody was going to kill him, I would have g[iven] him a head's up, you know. I wouldn't let somebody just, you know, sneak attack. I mean, there's-I mean, for what? For nothing.' In short, Cameron's direct testimony and his answers on cross-examination provided evidence of bias against defendants."
Id. at 194-95, 243 P.3d 31 (omission and last three brackets in Haugen ).
Petitioner's trial counsel also elicited testimony from an inmate, Stephen Brown, who testified that (1) Brown was housed next to *673 Cameron in the Special Management Unit at OSP and (2) Cameron told Brown that Cameron had lied to Oregon Department of Corrections staff and the state police about what happened the day of the homicide to "keep himself from getting in trouble."
Additionally, petitioner's and Haugen's trial counsel sought to impeach Cameron for personal interest by demonstrating "through cross-examination of Cameron and the testimony of other witnesses, that he had testified against defendants in exchange for favorable treatment in prison." Id. at 194, 243 P.3d 31 n 14. Among other points, petitioner's and Haugen's trial counsel elicited (1) testimony from Cameron that he had been convicted of rape, and that some "rapo[s] or rapist[s]" could be "picked on" or "pressured," and had to "look over their shoulder all of the time" in prison, (2) testimony from another inmate that being a "sorry, sorry rapo" is as "bad as a child molester," which is "supposed to be the wors[t] thing in the prison," (3) testimony from witnesses that served as the basis for argument that Cameron was cooperating because he wanted to be transferred to federal *518 prison, and (4) testimony from Brown that, as a result of Cameron's cooperation, Cameron was already receiving favorable treatment in prison.
During Haugen's closing argument, Haugen's trial counsel acknowledged that there was likely some truth to Cameron's testimony, given that the "clothes were where he said they were." Petitioner's and Haugen's trial counsel argued, however, that Cameron fabricated petitioner's and Haugen's confessions to obtain protection and favorable treatment in prison, and that Brown's testimony was credible.
In the post-conviction proceeding, petitioner introduced evidence in the form of affidavits from two other inmates, James Cale and Donald Pitchforth.
With respect to Cameron, Cale averred, in pertinent part:
"I knew Robert Cameron, who was called 'Snake[ ]' ***. Robert Cameron and his cellmate, who was called 'Barbarian,' ran a gambling table on the prison yard. They acted as 'the house' and they made and owed a lot of money.
"* * * * *
"It was known that, prior to David Polin's death, a guard had raided Robert Cameron and Barbarian's cell, and had confiscated the extra commissary items that they stockpiled and used to pay their gambling debts. This put them in the precarious position of being unable to meet their obligations.
"* * * * *
"Because of the gambling debts Robert Cameron was unable to pay, he had a motive to be placed in protective custody, for his safety as well as to walk away from his debts. By giving information to state investigators about Gary Haugen and [petitioner], Robert Cameron was able to do just that."
Similarly, with respect to Cameron, Pitchforth averred, in pertinent part:
"I was celled up with Robert Cameron's brother William prior to and at the time [the victim] was killed. ***
*519 "* * * * *
"I knew that Robert Cameron owed a lot of money on gambling debts that he could not pay; a situation which could put him in danger. Because of this he had a motive to cooperate with the state in order to get protection."
As noted above, petitioner contends on appeal that his trial counsel was ineffective for failing to "do an adequate independent, reasonable investigation regarding Cameron's motives to lie." As a result, according to petitioner, trial counsel "did not reasonably offer evidence to counter or undermine Inmate Cameron's testimony," beyond what petitioner characterizes as a "bare attempt to cross-examine for bias." Petitioner further contends that Pitchforth's and Cale's statements concerning Cameron's inability to pay Cameron's gambling debts are admissible for the non-hear-say purpose of demonstrating that there was a prison rumor that Cameron could not pay his debts, as a "false prison rumor * * * would be just as much reason for [Cameron] to have a need to cooperate with the prison and prosecution as a truthful rumor."
*674 The superintendent responds that "the only testimony [petitioner] has proffered from Cale and Pitchfor[th] would not have been admissible at trial if [petitioner's] trial counsel had attempted to offer it, because it was inadmissible hearsay, lacking a proper foundation, and evidently nothing more tha[n] speculation and conjecture."
We need not decide whether the proffered statements from Cale and Pitchforth concerning Cameron's "motive to lie" are admissible, however, because even if the statements are admissible, and even if petitioner's trial counsel was inadequate and ineffective for failing to discover and present evidence that Cameron owed debts to other inmates that he could not pay-an issue we do not decide-petitioner has not demonstrated that he suffered prejudice as a result. Two considerations lead us to that conclusion.
First, petitioner is incorrect that his trial counsel "did not reasonably offer evidence to counter or undermine Inmate Cameron's testimony" beyond a "bare attempt to cross-examine for bias." To the contrary, the jury saw *520 Cameron's credibility "extensively" questioned and his testimony challenged on the stand, see Haugen , 349 Or. at 194, 243 P.3d 31, but, nevertheless, returned a verdict for the state. See Davis v. Woodford , 384 F.3d 628, 641-42 (9th Cir 2004), cert. dismissed , 545 U.S. 1165, 126 S.Ct. 410, 162 L.Ed.2d 933 (2005) ("[I]t is almost impossible to believe that a jury-already aware that [the witnesses'] credibility was an issue-would have decided the guilt phase differently had it known [the witness] lied [about a minor incident]."). Indeed, during Haugen's and petitioner's trial counsel's "extensive[ ]" cross-examination of Cameron, they were able to demonstrate that Cameron was upset with petitioner and Haugen for making Cameron look guilty by involving him. Then, consistent with information they had elicited from Cameron, they introduced testimony from another inmate, Brown, who testified that Cameron had admitted to him that Cameron had lied to police about what had happened the day of the victim's death to "keep himself from getting in trouble." Trial counsel also argued that Cameron had the same motive to fabricate petitioner's confession as petitioner now posits his evidence supports-viz. , to receive protection while in prison. And, tellingly, petitioner does not convincingly explain how evidence of Cameron's purported gambling debts is any more probative of his bias or personal interest than the evidence and argument petitioner's trial counsel offered at trial-viz. , that Cameron needed protection because he was a "snitch rapo."
Second, in this case, even absent petitioner's and Haugen's confessions to Cameron, there was overwhelming evidence of petitioner's guilt. That evidence includes strands of petitioner's hair on the victim's clothing, images of petitioner moving the victim's body shortly after the murder occurred, bloodstains on petitioner's clothing, injuries on petitioner's hands, and testimony from an inmate that the day before the murder petitioner had approached the victim clenching his fist before Haugen told him "Stop, not here." See Strickland , 466 U.S. at 696, 104 S.Ct. 2052 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); Brown v. Schiedler , 198 Or. App. 198, 208, 108 P.3d 82, rev. den. , 339 Or. 66, 118 P.3d 802 (2005) (failure to impeach witness not prejudicial because there was other evidence *521 that was "highly probative" of petitioner's guilt); Harris v. Morrow , 186 Or. App. 29, 32, 46, 63 P.3d 581, rev. den. , 335 Or. 479, 72 P.3d 76 (2003) (failure to review and use impeachment evidence not prejudicial where there "was such other overwhelming evidence of petitioner's guilt as to render defense counsel's failure to impeach" witness "inconsequential" (internal quotation marks omitted)). This case did not turn on a credibility contest where the undiscovered impeachment evidence went to the heart of the prosecution's case against petitioner. Cf. Stevens , 322 Or. at 108-10, 902 P.2d 1137 (the petitioner was prejudiced by trial counsel's failure to interview several witnesses in connection with a rape trial where the witnesses' "testimony would have impeached the complaining witness with her inconsistent accounts of the alleged rape," there was "no physical evidence of abuse or trauma," and, *675 consequently, the case "necessarily turned on the credibility of the complaining witness and of petitioner").
For those two reasons, we conclude that the post-conviction court did not err in denying petitioner's claim for post-conviction relief with respect to trial counsel's purported failure to perform a reasonable, independent investigation of Cameron's motive to lie. Even assuming that trial counsel's investigation of Cameron's motive to lie was somehow deficient-again, an issue we do not decide-petitioner has not shown that that failure caused him prejudice, because he has not demonstrated that it had a tendency to affect the result of the criminal trial or that there is a reasonable probability that the result of the criminal trial would have been different had such an investigation occurred.
C. Trial Counsel's Purported Failure to Investigate the "Standing-Jigs" Defense and Present a Reasonable Defense Strategy
We next analyze (1) petitioner's contention that trial counsel was inadequate and ineffective for failing to "investigate and develop evidence that petitioner was 'standing jigs' as a lookout for [a] tattoo session at the time" of the killing and (2) his related contention that trial counsel failed to "choose and present a reasonable theory of defense." Petitioner asserts that "the only reasonable theory of defense"-which petitioner terms a "standing-jigs"
*522 defense-was that petitioner, at the time of the killing, "was acting as a lookout for a tattoo session between Haugen and [the victim], and that petitioner's participation was at most limited to helping to move an already dead body and helping to clean up." Although petitioner's two contentions are related and, to some extent, overlap, we analyze them separately.
Again, we begin by summarizing the evidence and argument from the underlying criminal trial, as well as the evidence adduced at the post-conviction proceeding that is relevant to petitioner's contentions. As noted above, and as described further below, during petitioner's criminal trial, petitioner's and Haugen's trial counsel's strategy was to argue that the state had failed to prove its case. Additionally, petitioner's trial counsel sought to "distance [petitioner] as much as [they] could from the activity outside the band room." Specifically, during closing argument, Haugen's trial counsel argued, among other points:
"[The state has] proved that [petitioner and Haugen] were the fall guys at least and cleaned up a murder scene. Yes, they were there. Absolutely. But did they put a knife in the hands, or a bludgeon in the hands of any of these guys? Not if you look at the evidence. Not at all."
Petitioner's trial counsel argued, among other points, that (1) security cameras showed that petitioner and Haugen were in the bathroom at the time that the victim was killed, (2) petitioner's "contact" with the victim's body was the "explanation for the physical evidence" in the case, and (3) "there was no evidence that was presented [at] this trial that [petitioner] or *** Haugen ever thought that [the victim] was the snitch."
During the post-conviction proceeding, petitioner called one of his trial counsel, Storkel, who testified about why, during the underlying criminal trial, the defense team presented the defense that it did. Storkel explained that he recalled that his investigators had received information from inmates indicating that they had "observ[ed] [petitioner] standing guard in the hall while Haugen was in the alcove with the victim." Storkel further explained that he discussed the "standing guard theory" with petitioner, and *523 that petitioner "did not want to use that defense," as it would have "finger pointed" at Haugen.
Instead, according to Storkel, petitioner requested that his counsel pursue a "make the state prove it" or "prove it[,] we only cleaned it up" defense. Storkel explained that petitioner requested that his counsel not engage in "any kind of finger pointing towards anybody else," including Haugen, and "made it clear to [Storkel] that [Storkel] would not be able to say other people's names and basically force [petitioner] into being viewed as a snitch." After considering alternative defenses, Storkel concluded the defense requested by petitioner "had as good a chance as any" and was "as good a theory as anything *676 else, based on the facts of the case." Accordingly, he was "compliant" with his client's wishes.
Storkel also explained that, as a result of petitioner's preferred theory of defense, Storkel "wasn't going to * * * develop[ ] something that could have been any kind of finger pointing towards anybody else." He testified that the joint defense agreement memorialized the parties understanding that "we were not going to be finger pointing," and that he believed that entering the joint defense agreement was a "good idea" because, although he was "confident" that petitioner and Haugen were not "going to rock the boat by pointing fingers," he was not "totally confident" that Haugen's counsel "would not do that."
During the pendency of the post-conviction proceeding, the superintendent deposed petitioner. During that deposition, petitioner testified, consistent with Storkel's recollection, that petitioner would not "point the finger at someone" who committed a crime. Petitioner also explained that he would be "snitching" if his attorneys indicated that someone else committed a crime, which would put his "life in danger":
"Q: Is it okay for your attorneys to [point the finger at someone for a crime]?
"[Petitioner]: Not really, no. * * * [I]f they do something that I feel is terribly wrong or something like that, I will most vocally say no. * * * Because you're putting my life *524 in danger if something goes-because, regardless of what your attorneys do, it is a byproduct of what you're telling them. So by proxy, you know they call it dry snitching. I just call it snitching. Dry snitching means that you snitched through somebody else, right? I just called it snitching, right. And the problem is, is that's what the yard calls it. And if they see something in the paper that shows your attorney's doing a lot of stuff, hey wait a minute, this is fucked up here."
Accordingly, petitioner testified during his deposition that he would "[a]bsolutely not" have allowed his trial counsel to "make [him] a snitch." He also testified that he "may have" written notes to counsel during his trial indicating that, if they asked certain questions, he would "stand up and make a scene," as that "sounds exactly like something [he] might say."
On appeal, petitioner points to, among other evidence, various affidavits submitted into evidence during the post-conviction proceeding to support his contentions that his trial counsel rendered inadequate and ineffective assistance by failing to (1) investigate the "standing-jigs" defense and (2) "choose and present a reasonable theory of defense." Those affidavits include the affidavits of Cale and Pitchforth, as well as an affidavit from another inmate, Grover Clegg. According to petitioner, the Cale, Pitchforth, and Clegg affidavits establish that the victim (1) "was a prison tattoo artist who had used the alcove where the killing took place to do tattoos," (2) "had given Haugen tattoos in the past," and (3) "planned to do so [again] on the day of the killing." Additionally, petitioner provided affidavits from two other inmates, Gerald Batty and Denis Harper, concerning, among other purported facts, their observations of petitioner the morning of the murder. Specifically, Batty averred, in pertinent part:
"On the morning [the victim] was killed, I was in the video room of the activities area. ***
"* * * * *
"I distinctly recall seeing [petitioner] standing 'jigs,' or lookout, at the end of the hallway near the Band Room *525 early that morning. It was commonly understood among all inmates that when an inmate was standing 'jigs,' no one should go to that area.
"* * * * *
"The area near the Band Room was a well-known location for conducting business and activities of all kinds, including dealing drugs, having sex, and tattooing.
"* * * * *
"I left the Activities area for shower call and clothing exchange, and after that I went back to my house. ***
"* * * * *
*677 "I was never contacted by anyone from either [petitioner's] or Haugen's defense teams."
Harper averred, in pertinent part:
"At some point while I was waiting around, I saw [petitioner] at the end of the hall near the Chicano Club. He appeared to be 'standing jigs,' or lookout. It was not unusual to see someone standing jigs in that area.
"* * * * *
"While I was in the band room office[,] *** Chad Ramsey left and came back. He told us there was a problem in the band room area, so I went down the hall and looked through the outer door of the band room area. I saw Gary Haugen slumped on the floor in a mess. I did not see anyone else there. I also noticed bloody footprints leading away from that area toward the restroom.
"* * * * *
"I got some rags and cleaning supplies from the area behind the stairs leading up to the next floor. On the way back to the band room area I saw [petitioner] leading Gary Haugen to the restroom.
"* * * * *
"I was subpoenaed by the defense to testify ***. They did not ask me what I knew or had seen prior to discovering [the victim's] body in the band room."
*526 Harper also averred that he had witnessed Haugen throw a shank out of the bathroom window.[5]
With respect to petitioner's first contention, that his trial counsel was inadequate and ineffective for failing to "investigate and develop evidence that petitioner was 'standing jigs' as a lookout for [a] tattoo session at the time" of the killing, we conclude that the post-conviction court did not err in denying petitioner's claim for relief regarding this purported deficiency. Even assuming that trial counsel's investigation was somehow deficient-an issue we do not decide-petitioner has not shown that he was prejudiced by that failure, because evidence regarding petitioner "standing jigs" would not have been presented to the jury given the theory of defense that petitioner insisted upon, i.e. , the "make the state prove it" defense, and his insistence that his trial counsel not "make [him] a snitch."
Whether trial counsel would have presented evidence that petitioner was "standing jigs" had they conducted a more thorough investigation is a question of fact. Lichau , 333 Or. at 363, 39 P.3d 851 (whether trial counsel would have "proceeded with the alibi defense had he been aware of the evidence presented at the post-conviction hearing is a question of fact"). As such, we are bound by the post-conviction court's findings if they are supported by evidence in the record. Id. Here, the post-conviction court found that "[n]o additional witnesses, tests or arguments were going to be used given the defense [petitioner] insisted upon." That finding, at least with respect to evidence regarding petitioner "standing jigs," is amply supported by evidence in the record, as summarized above. In particular, the evidence in the record supports the post-conviction court's finding that petitioner "would allow no testimony or defense that pointed toward Mr. Haugen committing the acts resulting in the death of [the victim] or implicating him in any way," which is precisely what presenting the "standing jigs" defense would have done, as it would have placed Haugen in the alcove with the victim at the time of the murder. That evidence *527 includes, among other evidence, Storkel's testimony that (1) Storkel recalled that his investigators had received information from inmates indicating that they had "observ[ed] [petitioner] standing guard in the hall while Haugen was in the alcove with the victim," (2) Storkel discussed the "standing guard theory" with petitioner, and then (3) petitioner "did not want to use that defense," as it would have "finger pointed" at Haugen.
As a result, our prejudice inquiry must "proceed from the premise" that the jury would not have heard the "standing jigs"
*678 evidence even if petitioner's trial counsel had conducted a more thorough investigation. Cf. id. (noting that the "prejudice inquiry * * * must proceed from the premise that the jury would have heard the alibi evidence that [the] petitioner presented at the post-conviction hearing" because the post-conviction court's finding that the petitioner's trial counsel would have presented such evidence to the jury had he been aware of it was supported by evidence in the record). Because the record shows that the "standing jigs" evidence would not have been presented to the jury given the theory of defense that petitioner insisted upon, we see no possibility that the outcome of petitioner's criminal trial could have been different had a more thorough investigation of the "standing jigs" defense occurred. Cf. Cox v. Premo , 297 Or. App. 302, 319-20, 440 P.3d 81 (2019) (granting post-conviction relief where "reasonable counsel would have" presented certain evidence and such evidence created "more than a mere possibility" that "the jury would have rejected" important testimony of one of the state's witnesses).
We next turn to petitioner's second contention-viz. , that trial counsel was ineffective and inadequate for failing to "choose and present a reasonable theory of defense." Petitioner contends that the theory of defense trial counsel chose was deficient because it "did not offer any counter narrative that would suggest that it was not petitioner himself who killed [the victim]" and "did not address or contextualize the indisputable evidence that petitioner was at least involved in the clean-up of the *** killing." Petitioner acknowledges that "the record indicates that [he] would have refused to testify and would have 'vocally' objected to"
*528 the presentation of a theory of defense that would implicate Haugen, but argues that his intent not to implicate Haugen does not "excuse" trial counsel's failure to present the "standing jigs" defense because, among other reasons, "the law and legal norms did not mandate that criminal defense trial counsel defer to their client's strategic directives on what theory of defense to offer." According to petitioner, the post-conviction court erred by-as petitioner characterizes it-"ruling" that "criminal trial counsel's otherwise deficient representation was excused by petitioner's intent not to implicate Mr. Haugen." As we understand petitioner's argument, his contention is that constitutionally adequate and effective defense counsel would have presented the "standing jigs" defense over petitioner's objection.
The superintendent's response is fourfold. First, that petitioner "personally insisted that his trial counsel pursue only the defense that they did, because he did not want to suggest, in any way, [that] Haugen committed the murder" and "it is well established that when the defendant personally chooses not to assert an available defense at trial, his trial counsel is obligated to respect that choice and cannot later be faulted in a post-conviction proceeding for having acceded to his client's choice." (Emphasis in the superintendent's brief.) Second, that "petitioner failed to present evidence to the post-conviction court that would have been admissible in the underlying criminal trial that would have provided a basis for such a defense." (Emphasis in the superintendent's brief.) Third, "petitioner does not contend that his trial counsel should have called either him or Haugen as a witness at trial" and, consequently, "there was [no] means for [petitioner] to establish, by admissible evidence, what petitioner knew or intended at the time the victim was murdered, much less that he was only 'standing jigs' while Haugen, unbeknownst to him, murdered the victim." Fourth, "presenting evidence that petitioner and Haugen conspired together to lure the victim to the location where he was murdered and that petitioner then was 'standing jigs' in that hallway while Haugen savagely murdered him would have simply buttressed the state's already-overwhelming case."
*529 Initially, we note that "our cases make clear that a petitioner's choice to follow a particular trial strategy is 'not dispositive' of whether counsel provided effective assistance." Holcomb v. Taylor , 285 Or. App. 462, 475, 397 P.3d 517 (2017) (quoting Montez v. Czerniak , 237 Or. App. 276, 304, 239 P.3d 1023 (2010), aff'd , 355 Or. 1, 322 P.3d 487, adh'd to as modified on recons , 355 Or. 598, 330 P.3d 595 (2014) ). It is also true, however, that a petitioner's choice to follow a particular *679 trial strategy is relevant to our analysis. The analysis we undertook in Montez is instructive.
In Montez , the petitioner appealed a judgment denying post-conviction relief, arguing that the post-conviction court erred in rejecting his claims that his counsel provided "constitutionally ineffective assistance" during penalty-phase retrial proceedings. 237 Or. App. at 278, 239 P.3d 1023. Specifically, the petitioner argued that he was denied effective assistance of counsel when his counsel introduced evidence informing the jury that the petitioner had previously been sentenced to death and was then on death row. Id. at 298, 239 P.3d 1023. In rejecting that contention, we noted that it was the petitioner's choice to introduce such evidence and, consequently, "[i]t was petitioner's burden to show that his affirmative, well-documented choice to follow that strategy was the result of bad advice, and he did not carry that burden." Id. at 304, 239 P.3d 1023. We noted that that point was "not dispositive," because "counsel's duty can include trying to persuade a client against implementing an ill-advised litigation strategy," but "such persuasion may be more difficult, and in the end, unsuccessful, where, as the post-conviction court found here, the strategy originated with the client." Id.
Additionally, we considered the petitioner's claim regarding ineffective representation related to "the choice to call death row inmates to testify on petitioner's behalf." Id. at 305, 239 P.3d 1023. It was "undisputed that petitioner himself made the choice to call the inmates and that he personally chose the inmates who would testify," and "[a]lthough counsel initially questioned the wisdom of [that approach], they decided the approach was reasonable in light of the sparse mitigation hand they had been dealt." Id. at 306, 239 P.3d 1023. We concluded that, "[g]iven the dearth of other mitigating evidence *530 and petitioner's insistence on calling the inmate witnesses, counsel were not ineffective for following that strategy." Id. at 307, 239 P.3d 1023. We explained that " '[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.' " Id. at 306, 239 P.3d 1023 (quoting Strickland , 466 U.S. at 691, 104 S.Ct. 2052 (brackets in Montez )).
In this case, we conclude that the post-conviction court did not err in denying petitioner's claim for post-conviction relief with respect to trial counsel's purported failure to choose and present a reasonable theory of defense. Importantly, it was petitioner who requested that his trial counsel pursue the trial strategy that they did and it is undisputed that petitioner would not have allowed his counsel to present the defense that he now claims was the "only reasonable" choice-i.e ., "that petitioner was acting as a lookout for a tattoo session" between Haugen and the victim at the time of the murder-because, as noted above, that would have pointed toward Haugen committing the acts that resulted in the death of the victim, and also would have resulted in petitioner being identified as a "snitch." Further, the record is clear that petitioner's trial counsel had information that would support a "standing guard" defense, discussed the potential of presenting such a defense with petitioner, and that petitioner did not want to use that defense. Petitioner does not argue that his choice to pursue the defense that he did, and not pursue a "standing guard" defense, was the result of bad advice or that he could have been persuaded by his trial counsel to allow trial counsel to present the defense that he now claims was the "only reasonable" choice.
Nor, on this record, can we conclude that the trial strategy pursued by petitioner's trial counsel was "ill-advised." Montez , 237 Or. App. at 304, 239 P.3d 1023. To the contrary, as the post-conviction court expressly found, petitioner's trial counsel "made the best decisions available to them" given the "position [petitioner] held during the trial." Petitioner's trial counsel considered alternatives-including a "standing guard" defense-and concluded that the "make the state *531 prove it" defense petitioner requested "had as good a chance as any" given "the facts of the case." *680 We also observe that the "standing jigs" defense has its own deficiencies. First, as the superintendent notes, the "standing jigs" defense was consistent with the state's theory that Haugen and petitioner conspired together to lure the victim to the alcove to kill him. Second, even if, as petitioner contends, other inmates saw petitioner "standing jigs" "around the time" of the victim's death, that does not mean that petitioner did not participate in the murder. Third, the "standing jigs" defense does not explain petitioner's apparent willingness to move the victim's body with Haugen shortly after the murder. Fourth, if petitioner's trial counsel "pointed fingers" at Haugen, Haugen's counsel very well might have "pointed fingers" back, a concern that led to entry into the joint defense agreement.
As a result of the above considerations, we conclude that the post-conviction court did not err in concluding that petitioner's trial counsel did not render inadequate and ineffective assistance by failing to (1) investigate the "standing jigs" defense and (2) "choose and present a reasonable theory of defense."
III. CONCLUSION
In sum, we conclude the post-conviction court did not err in denying post-conviction relief as to the guilt phase of petitioner's criminal trial. Accordingly, we affirm.
Affirmed.

Petitioner's assignments of error one through three contain additional arguments that we reject without discussion. We also reject petitioner's other assignments of error without discussion.

Petitioner acknowledges in his briefing that the "factual history of the underlying crime was summarized adequately" in Haugen and Brumwell .

Petitioner and Haugen both tested positive for the presence of marijuana based on the sample from the August 31, 2003, test. The test results came back on September 5, 2003, three days after the murder.

Knowles explained how a "blood into blood" or "blood on blood" spatter is created: "[O]nce blood begins to accumulate on an object, if more blood falls into the blood, it creates a spattering affect around the bloodstain."

Petitioner acknowledges in his briefing that "Harper did testify at petitioner's criminal trial in the guilt phase, and his testimony at the criminal trial admittedly is not consistent with his statements in the affidavit."